THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MAURICE ENRIGHT, Plaintiff in Error.

*Opinion filed October 26, 1912—Rehearing denied Dec. 5, 1912.*

1. EVIDENCE—*question of mental condition of a witness is for the court.* A question as to the mental condition of a witness at the time of the trial relates to his competency to testify, and is a preliminary question for the court to determine.

2. SAME—*when insane person is competent to testify.* In the absence of any statute to the contrary, an insane person is competent to be a witness if he understands the nature of an oath and has sufficient mental power to give a correct account of what he has seen or heard.

3. SAME—*party knowing condition of mind of witness must object before he testifies.* One who knows, before the trial, that a witness is incompetent because of his mental condition must make his objection before such witness has given any testimony, and if he is ignorant of such condition before the trial he must make his objection as soon as such condition becomes apparent.

4. SAME—*when mental derangement does not affect the competency of witness.* Mental derangement which does not affect the subject matter of the testimony, either at the time of testifying or at the time of the occurrence testified to, does not render the witness incompetent.

5. SAME—*the court determines competency of witness and the jury his credibility.* It is for the court to decide upon the competency of a witness and for the jury to determine what credit shall be given to his testimony under the tests recognized by law.

6. SAME—*party cannot permit witness to testify and then prove him insane.* A party cannot permit a witness to give his testi-

mony without any objection to his competency and then offer evidence to show that he has been insane for many years.

7. SAME—*when objection that certain statements are privileged should be made.* The time to object that certain statements sought to be proved are privileged is when the opposite party attempts to examine the witness for the purpose of laying the foundation to prove the statements.

8. SAME—*when statements made to attorney are not privileged.* Statements made to an attorney by persons who witnessed a murder should not be excluded as privileged communications upon the ground that the attorney is appearing for the accused on the trial, where it is not shown that he was acting as attorney for the accused when the statements were made.

9. CRIMINAL LAW—*when proof of reason or motive for crime is unnecessary.* In a criminal prosecution the People are required to prove the commission of an act forbidden by law and to prove it beyond a reasonable doubt, but they are never required to prove a cause or reason that induced the accused to commit an act if without such proof the evidence is sufficient to show that the act was done by him.

10. SAME—*effect where People do not attempt to show motive.* While the People may show a motive for the crime and must prove the motive where it is attempted to be shown, yet the absence of any attempt by the People to prove a motive does not tend to show that the crime was not committed.

11. SAME—*what instructions are properly refused.* Instructions in a murder trial are properly refused which direct the jury to pass upon the evidence the same as though the defendant, who did not testify, were not allowed by law to testify, and which attempt to direct the attention of the jury to the mental condition of a witness who gave his testimony without objection to his competency.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM H. McSURELY, Judge, presiding.

JAMES T. BRADY, and FRANCIS W. WALKER, (WILLIAM S. FORREST, of counsel,) for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN E. W. WAYMAN, State's Attorney, (JOHN E. NORTHUP, THOMAS MARSHALL, E. C. HALL, ROBERT E. CROWE, and F. L. FAIRBANK, of counsel,) for the People.

Mr. Justice Cartwright delivered the opinion of the court: .

Vincent Altman was murdered while standing at the bar in the saloon of the Briggs House, in Chicago, at about one-thirty o'clock in the afternoon of March 22, 1911. The assassin shot him twice. One thirty-eight-caliber bullet, which was found, entered the right side and lodged in the liver. The other shot was in the back, and the bullet was left in the body and never found. Maurice Enright, the plaintiff in error, was indicted in the criminal court of Cook county for the crime and was found guilty by a jury, which fixed his punishment at life imprisonment, and the court sentenced him on the verdict.

The Briggs House is a hotel at the north-east corner of Randolph street and Fifth avenue. The saloon is in the south-west corner, on the first floor, and the room is about forty-five feet long north and south. There are three doors,—one at the corner of the two streets, another at the north-west corner, opening on Fifth avenue, and the third at the north-east corner, leading through a passageway to the west lobby of the hotel. The bar is on the east side and is thirty-two feet long, and extends from a cigar case near the south end of the room to within eleven or twelve feet of the north end, where it turns at right angles to the east wall of the room, with a hinged shelf for an entrance behind the bar. At the center, and behind the bar, is a cashier's desk somewhat above the bar, and the cashier faces the customers. At the north end of the room there are three booths,—one for the telephone and the others for other purposes,—and on the west side of the room are three open booths, with a table and seats in each. North of these booths there is a stairway next the west wall, leading down to the dining room in the basement, with a wooden partition on the east side of the stairway and a lunch counter in front of the partition. The space between the bar and the open booths and lunch

counter is about eight feet. The west lobby, into which the passageway from the saloon opens, has an entrance on Fifth avenue and extends east to the main lobby, which runs north and south, with the main south entrance and the ladies' entrance on Randolph street, between which two entrances there is a haberdasher's store. The west lobby is about sixteen feet wide north and south and thirty-five feet long east and west, and on the south side, west of the doorway from the saloon, is a stenographer's desk. On the north side, opposite the doorway, is the door of a florist's store, and extending east from that door along the north side to the main lobby is a magazine and cigar stand, opposite which there are three writing desks. The elevator is in the main lobby, at the north end of the haberdasher's store, with a north entrance. About five feet north from the entrance to the elevator a stairway rises to the west and about half way up turns to the south and runs east to the second floor, opposite the elevator. At the time of the murder the headquarters of Carter H. Harrison, candidate for mayor of Chicago, occupied the entire second floor and other rooms on other floors, with headquarters of about every known nationality in different rooms, and the lobbies and headquarters were crowded with people. Room 508, on the fifth floor, was occupied by a committee of the local union of the United Association of Steam Fitters and Plumbers, including Simon O'Don-nell, Thomas Kearney and James Garvin, and the de-fendant was the business agent for that union and was frequently in and about that room. He was in that room up to the noon hour of the day of the murder. At the time he was shot Altman was standing about the middle of the bar, which was crowded with men standing in front of its entire length and some feet out from it. There were from forty to sixty men in the room and the whole room was filled. The man who killed Altman wore a gray over-coat and a black hat, and so far as appears from the tes-

timony there was but one man in the room dressed in that way. John J. Brittain, a general contractor, who was standing near the north passageway into the west lobby, caught and held for a few moments a man wearing such an overcoat and hat who was rushing out of the room. The man either got away from him or was let go and ran into the west lobby. He then turned toward the main lobby, and was caught and held near the cigar stand by Gary S. Troy, a salesman for an automobile company. The man said, "For God's sake, let me go!" and Troy let him go. He ran around in the main lobby and up the stairs.

There is no reasonable doubt that the man who killed Altman is the one with whom Brittain and Troy grappled and who ran around the main lobby and up the stairs. The direct evidence that that man was the defendant is as follows: Fred H. Irish testified that he was in the saloon, a few feet from Altman, and heard the two shots in quick succession and saw the man who fired them; that the man went out through the lobby of the hotel, and that he was the defendant, Maurice Enright. Arnold Warner, a bell boy at the hotel, who knew the defendant and had waited on the men in room 508 and served drinks to them, testified that he was standing in the door of the florist's store, in the west lobby; that he heard two shots fired and turned around and went to the bar-room door; that he saw Brittain holding the defendant, Enright, from behind; that the defendant said, "Brittain, for Christ's sake, John, let me go!" and Brittain let him go; that the defendant then ran by Troy, who was standing by the cigar case; that the defendant said something to Troy which the witness could not make out, and Troy let him go; that he ran up the stairway and tripped when he came near the top of the stairs, and that when he ran through the lobby he put a gun in his pocket. Norman Goldstein, another bell boy who worked at the Briggs House and who was acquainted with the defendant, testified that he was near the middle

256 — 15

of the magazine stand, about twelve feet from the entrance to the saloon; that he heard the shots fired, and the crowd came running out of the door; that he was pushed down and when he was getting up saw a man holding the defendant; that he afterwards learned that the name of the man holding the defendant was Troy; that the defendant tried to get away from Troy; that Troy held him not more than five or ten seconds and after Troy let him go he ran toward the main lobby. Troy testified to catching the man who ran out of the saloon, and identified the defendant as the man. William Barnett, the elevator conductor, observed the commotion at the time of the shooting and testified that he took the defendant on the elevator at the second floor; that he came from toward the stairway, and that the witness knew him and had taken him up in the elevator several times. All these witnesses said that he wore a gray overcoat and a black hat.

Several witnesses testified that the defendant was not the man that did the shooting. John J. Brittain, who caught and held the man, testified that at the firing of the first shot he turned around toward the bar; that the man broke away from where the shot was fired and ran toward the witness and he grabbed him; that they struggled afterward to a point in the passageway, where he let him go; that the man he took hold of was not the defendant, and that the man said, "There he goes! Out the other door!" and the witness let go of the man and ran toward Fifth avenue to catch the other man. According to this witness he caught the right man and let him go to run after some unknown person on the suggestion of the criminal. Morgan J. Gragin, a steam-heating contractor, testified that he saw the man that did the shooting; that he did not know what became of him, because the witness ducked out of the front door after the shot, and when the defendant stood up at the trial the witness said that he was not the man. William O'Brien, a cigar salesman, said that

he heard the shots, saw the flash of fire, and saw the man
from whom the flash appeared to come; that he looked at
the defendant when he came into court and that he was
not the man.   Harry Hall, the cashier in the saloon, said
that he heard the shots and looked up but did not see the
defendant around that day, and that he was not in the bar-
room to his knowledge.   Michael Freeman, the manager of
the saloon, testified that he was standing at the north end
of the saloon, close to the lunch counter, when the shoot-
ing occurred; that he looked around and saw a man with
a gun in his hand; that the witness ran into the lobby when
he heard the shots fired, and that the man who held the
gun was not the defendant.   John S. Kelly, who was in
the plumbing business, could not say that he saw the man
that shot Altman, but immediately after the shooting a
man who was standing with Altman ran by the witness
and was sticking a revolver in his coat pocket, and the de-
fendant was not in the saloon.   William H. Ehmann was
assistant sheriff at the time of the trial, having received his
appointment some months after the murder.   He testified
that he was standing at the hinged shelf, at the north end
of the bar; that he saw the man that did the shooting pull
a revolver and heard the shots fired; that he did not know
where the man went who fired the shots; that the first time
he saw the defendant was in the county jail, and that he
backed out as soon as he could and was one of the first ones
out.   This witness, according to his own testimony at the
trial, made his escape with the crowd in the general getaway
from the scene of the murder, and how much the fright-
ened witness saw and how reliable his testimony was from
the glimpse he had of the man was a question for the jury.
John J. Mahoney said that he was a physician and surgeon
and had been in the saloon about two and one-half hours,
patronizing the bar and drinking during all that time, but
he said that he was not drunk; that he heard the shots
fired and saw a man turning away with a revolver, and

that he was not the defendant. Thomas P. Noonan, vice-president of the Electrical Workers' Brotherhood, testified that he was in the main lobby when there was a commotion; that some people came running through the lobby and he saw a man with a dark overcoat, and that the defendant was not among the first few that he saw running up-stairs. This testimony could hardly be considered as tending to prove anything in the case. There was other testimony of about equal importance. Julia F. Adams, the stenographer, said that she heard the shots and saw men coming out of the saloon, and saw a man standing alone, with a gun, at the end of the cigar stand, who appeared to be putting the gun in his right overcoat pocket, but he was not the defendant. She did not see anyone grapple the man at the door of the saloon and did not see Troy but was scared, and as soon as she saw the gun she ran into the florist's store opposite her desk. Edna Hanson, the clerk at the magazine counter and cigar case, heard the shots and saw the crowd of men going out and got under the counter for safety. She did not see the defendant and was where she could not see him or anyone else.

Besides the direct evidence there was circumstantial evidence relating to the identity of the person who committed the crime. That person wore a gray overcoat and a black hat, and the defendant had, and was accustomed to wear, a gray overcoat. There was a settee in the hallway on the second floor, and M. J. Doyle, an electrical worker, testified that he saw someone running up the stairs and someone running after him, and the first person ran by the witness down the hall and threw off his overcoat on the settee, and that it was not the defendant. After the shooting a gray overcoat was found on the settee in the passageway west and south of the elevator. In the pocket there was a thirty-eight caliber revolver containing cartridges and an empty shell of a cartridge. The bell boys, Warner and Goldstein, testified that Enright was wearing this coat or

one exactly like it, and Warner said that he knew the over-
coat and the defendant had checked it with him ten or fif-
teen times.    Another gray overcoat was produced at the
trial with testimony that it was the overcoat of the defend-
ant.    Three of his sisters testified that the overcoat found
on the settee did not belong to the defendant, and a cloth-
ing cutter, on an exhibition made before the jury, testified
that it did not fit him.

It will be seen that the determination of the question
whether the defendant was the person who committed the
crime depended almost wholly upon the credibility of the
witnesses, and that if all the testimony is considered we
ought not to overturn the finding of the jury on that con-
troverted question.    It is contended that in considering
whether the conclusion of the jury was right we should
entirely reject the testimony of Fred Irish.    Nothing ap-
pears from a reading of his testimony which would war-
rant us in doing so.    It was given in a clear and intelligible
manner, and he withstood a cross-examination covering
104 pages of the record as creditably as the average wit-
ness.    There was evidence that he had been a book-maker
at races; that he had epileptic fits, and had one between
eight and nine o'clock on the morning of the murder; that
such a fit would leave a person for a time in a dazed con-
dition, and that two hours before the murder he was un-
der the influence of intoxicating liquor and pretty drunk.
We have been unable to find anything in his testimony in-
dicating that he was not able to give a correct account of
what he saw and heard or that he did not do so.    If his
testimony were eliminated we would still be unable to say
that the verdict of the jury was not fully justified by the
other evidence in the case.    The defendant was identified
by the two bell boys, who knew him well, and by Troy,
and was also identified as having taken the elevator at the
second floor when he ran up-stairs.    At the time of the
shooting there was great confusion and an immediate scat-

tering of the large crowd of people in the saloon, who sought safety in flight in every direction, and the jury might reasonably conclude that members of the frightened crowd who were running away gave but little attention to the identity of the individual. It would be very strange if some other man wearing a gray overcoat and black hat committed the crime and vanished in some mysterious way from the scene. Reading the testimony at length we find many things tending to cast doubt upon the testimony for the ·defendant, and we cannot say that the conclusion of the jury, who were in a position to determine what witnesses were worthy of credit, was not correct.

The defendant offered to prove by four women, one of them the wife of Irish, that he had been in the habit of indecently exposing himself to women and children and that in their opinion he was insane, and also to prove by his son that he was of unsound mind, and the court sustained an objection to the offer. It is contended that this evidence was competent on the question of the credibility of the witness. No objection was made to the competency of the witness when he testified, and a question as to the mental condition of a witness relates to his competency to testify and is a preliminary one for the court. It would be contrary to every rule of practice to permit parties to enter upon the trial, before the jury, of collateral questions as to the sanity or mental condition of witnesses at the time of the trial. In Texas, Idaho, and perhaps other States, there are statutes declaring persons of unsound mind incompetent to testify if the conditions specified in the statutes exist, but we have no such statute, and the common law rule is that an insane person is competent to be a witness if he understands the nature of an oath and has sufficient mental power to give a correct account of what he has seen or heard. A lunatic, from the condition of his mind, might not be a competent witness, but his competency on that ground, the same as want of capacity from

infancy or other cause, must be determined by the court. If a party knows before the trial that the witness is incompetent on account of mental condition the objection must be made before he has given any testimony, and if the objection appears upon the trial it must be interposed as soon as it becomes apparent. If a witness appears to be or is shown to be afflicted with insanity respecting the subject matter of the litigation or to have been insane respecting such subject matter at the time of the event which he is offered to prove, he is an incompetent witness and ought not to be allowed to testify; but even if there is mental derangement and it does not affect the subject matter of the testimony either at the time of testifying or at the time of the occurrence, the witness is competent. (*Regina* v. *Hill,* 5 Cox's Crim. Cas. 259; *District of Columbia* v. *Armes,* 107 U. S. 519; 2 Elliott on Evidence, sec. 753; Underhill on Crim. Evidence, sec. 203; *Cannady* v. *Lynch,* 27 Minn. 435; *Holcomb* v. *Holcomb,* 28 Conn. 177; *Bowdle* v. *Detroit Street Railway Co.* 105 Mich. 172; *Worthington* v. *Mencer,* 96 Ala. 310; *State* v. *Simes,* 12 Idaho, 310; 9 Ann. Cas. 1216; *State* v. *Hayward,* 62 Minn. 474; 30 Am. & Eng. Ency. of Law,—2d ed.—934; 40 Cyc. 2201, 2242.) It is for the court to decide upon the competency of the witness and for the jury to determine what credit shall be given to his testimony under the various tests recognized by the law. (*Kelly* v. *People,* 29 Ill. 287.) The fact that a person has so little mind and capacity that a conservator is appointed for him does not render him incompetent as a witness. (*Champion* v. *McCarthy,* 228 Ill. 87.) The mere fact of mental derangement on some subject unconnected with the subject matter of the litigation and which does not affect the testimony of the witness in any way is not to be considered by the jury in determining his credibility, but if there is anything in the evidence before the court which the jury might fairly consider on the question of

credibility, such evidence may, under proper instructions from the court, be given to them. The defendant had the benefit of evidence that the witness was subject to fits and that he was under the influence of intoxicating liquors two hours before the murder. The offer was to prove that Fred Irish was insane and to prove by his wife and son that he had been insane for ten years, so that the offer did not come within the rule adopted in *Holcomb* v. *Holcomb, supra,* where the court said that the question whether a person who is offered as a witness is insane goes to his competency and is for the court, but held that if the witness is sane but was insane at the time of the transaction to which he testifies, his insanity may be proved to affect his credibility. The court did not err in the ruling.

It is also claimed that the court erred in permitting the People to prove, by a stenographer, statements of the witnesses Brittain and Kelly, taken down the day following the murder, when the witnesses were interviewed in a room of the Briggs House by Charles E. Erbstein, who appeared as attorney for the defendant on the trial. The claim is that the communications were privileged. On the cross-examination of the witnesses their attention was called to the time and place and they were asked whether they did not make certain answers to questions of Erbstein, for the purpose of laying the foundation for proving their statements. No objection was made to that examination, and if the statements were privileged, the time to object was when those questions were asked, otherwise it would put the prosecution in the position of asking questions whether the witnesses had not made certain statements, when the statements could not be proved because privileged. Aside from that question, the statements were not privileged for the reason that there was no evidence that Erbstein was the attorney for the defendant at the time they were made.

Irish and the bell boys had been provided for and maintained for a time by Nicholas Hunt, an inspector of police,

and it is contended that the court erred in refusing to permit evidence of how much was paid for that purpose. No proof was offered which would tend in any degree to show that the testimony of the witnesses was purchased, and the court did not err in excluding the evidence.

The defendant produced as a witness a clothing cutter and had the two gray coats put on the defendant in the presence of the jury as demonstrative evidence that the coat found on the settee did not fit him. The clothing cutter testified that the coat found on the settee did not fit the defendant and that the coat produced by the defendant fitted him better. It is contended that the court erred in refusing to let the jury feel of the coat on the defendant during this exhibition. The defendant did not testify in the case and had all the benefit that he was entitled to in making the exhibition before the jury without testifying.

A witness testified that in the police station she saw the overcoat which had been found on the settee, on the defendant, and said to Inspector Hunt that she thought it was the overcoat she had previously seen on the defendant, and the defendant did not say anything. The court refused to strike out the statement. Nothing was said to the defendant, and the witness was only expressing her opinion that it was the same overcoat. We do not think the jury would take the statement that the defendant said nothing as an admission of the fact that it was his overcoat, and, of course, he could not deny that the witness thought that it was the same. The jury would not consider his failure to deny the statement of the witness that she thought the overcoat was the same, as an admission that it was, in fact, the same, and therefore we do not think that any harm came from the ruling.

It is argued that the court erred in giving instructions numbered 2 and 3 at the instance of the People and refusing instructions 2 and 20 asked by the defendant, and the reason given is, that there was no evidence tending to

prove that the defendant had any motive to kill Altman. Instructions 2 and 3 given at the request of the People did not relate to the subject of motive but correctly defined malice as a matter of law. Instructions 2 and 20 presented by the defendant and refused, stated that if the evidence failed to show any motive on the part of the accused to commit the crime charged, the jury had no right to assume that he may have had such motive, and if the evidence failed to show any motive, then this was a circumstance which the jury ought to consider, in connection with all the other evidence in the case, in arriving at their verdict. In a criminal prosecution the People are required to prove the commission of an act forbidden by the law and to prove it beyond a reasonable doubt, but they are never required to prove a cause or reason that induced the accused to commit the act if without such proof the evidence is sufficient to show that the act was done by him. If the accused committed the act, the question whether he had a motive, or what it was, is immaterial. Evidence tending to show the existence or non-existence of a motive is admissible and is frequently important to be considered in connection with the other evidence in the case, and although the People are under no obligation to show a motive for the commission of a criminal act they may do so. If the People claim that a motive existed inducing the commission of the act it must be proved, and, like any other circumstance, cannot be inferred, but as they are not required to show any motive a jury should not be informed that failure to show it tends to prove that the crime was not committed. In this case both parties abstained from offering any evidence touching any relations between Altman and the defendant, their acquaintance or want of acquaintance with each other, or any other fact tending to prove that there was or was not any motive on the part of the defendant to commit the crime with which he was charged. The instructions were calculated to mislead the jury to understand that the law

required evidence of a motive for the crime, and as the fact was not in issue the instructions were properly refused.

Instruction 23, which was refused, directed the jury to pass upon the evidence as though the defendant were not by law allowed to testify. That is not the law, and the law on the subject was given, at the request of the defendant, in instruction 32 in the language of the statute, with its qualifications.

Refused instruction 4 was on the question of reasonable doubt, and the same principle was given to the jury in several instructions.

Instruction 24, refused, added to the usual tests of credibility of a witness that the jury should consider that a witness had a mental defect that might lead him to fabricate that which he did not see, and that they might consider the impaired mental faculties of any witness. It was an attempt to call attention to the alleged mental condition of the witness Irish, and the court did right to refuse it.

Objection is made to the argument of the State's attorney. The language used was strong and emphatic, but there was very little which exceeded the reasonable bounds of argument and natural inferences that might be drawn from the facts and circumstances presented. Wherever anything was said which was not justified by the evidence the court sustained objections to it.

On the motion for a new trial affidavits of John H. Doherty and Alfred J. Jurgensen were presented to the court, but the facts stated were cumulative and not conclusive in their nature.

Considering the nature of the case and the length of the trial the record is unusually free from error, and we find no sufficient ground in the evidence for reversing the conclusion of the jury and the trial court as to the facts.

The judgment is affirmed.        *Judgment affirmed.*