THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DONALD SEEL, Defendant-Appellant.

First District (1st Division)   No. 77-1617

Opinion filed January 16, 1979.—Rehearing denied March 14, 1979.

Ralph Ruebner and Gary Jay Ravitz, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and James V. Marcanti, Assistant State's Attorneys, of counsel), for the People.

*Mr. JUSTICE BUCKLEY delivered the opinion of the court:

This is an appeal by Donald Seel from his conviction after a jury trial for the murder of George Palcer on or about July 31, 1975.

Seel urges reversal of that conviction on four grounds. First, he alleges denial of due process in the refusal of the trial court to allow defense counsel to participate in a *voir dire* examination of the chief prosecution witness prior to her testifying. Second, he alleges that the refusal of the trial court to have that witness examined by a psychiatrist prior to her testifying constituted an abuse of discretion. Third, he contends that the evidence produced at trial did not establish his guilt beyond a reasonable doubt. Finally, he asserts that improper remarks by the prosecuting attorney in his opening statement denied him a fair trial.

For the reasons stated below, the judgment of conviction against Donald Seel is affirmed.

The testimony at Seel's trial in the Cook County Circuit Court, Judge Philip Romiti presiding, may be summarized as follows:

Police Officer John Toenings testified that at 6:30 a.m. on July 31, 1975, he viewed the body of George Palcer in the gangway behind 5023 North Winthrop in Chicago. He observed injuries to the victim's head and upper torso. Fifteen to twenty minutes later he entered apartment number 222 of that address and observed a pool of blood and blood-spattered walls in the living room, with a trail of blood spots leading to the back door. He found a blood-stained yellow shirt in the washroom.

Dr. Yeksel Konakci, a coroner's pathologist who performed an autopsy on Palcer's body on July 31, 1975, testified that Palcer died of cranial injuries and strangulation, and that there were marks on the neck

___

* This opinion was prepared by Justice Buckley while assigned to the Illinois Appellate Court, First District.

consistent with impact strangulation, which could have been caused by a shoe.

Officer James Nolan found the defendant, Seel, with his eyes closed in a closet in apartment 222 at 4:30 p.m. on July 31, 1975.

The parties stipulated that the yellow shirt found by Toenings and a grey pair of trousers and boots seized from defendant at the time of his arrest were preserved for microanalysis, and that Palcer's hair was dark brown.

Mary Ann Mohan, a police microanalyst, testified that B-type human blood was present on Seel's trousers and boots as well as on the yellow shirt. A blood sample from the apartment was also B-type. She also found dark brown human hair on the bottom of the boots. Mohan testified that the deceased's blood-type was B, which is found in about 12 percent of the population and that Seel's blood-type was O, found in 45 percent of the population. A-type blood was also found on the boots and shirt.

The only eyewitness to testify was Sophia Nash. Prior to trial defense counsel had filed a written motion to have Nash examined by a psychiatrist. The motion was argued and denied. Subsequently the trial court conducted an *in camera* examination of Nash in the presence of counsel, but did not allow counsel to pose questions to Nash. Details of this motion and the *in camera* examination are discussed in connection with Seel's contention that the trial court's handling of these matters constituted an abuse of discretion. The trial court determined that Nash was competent to testify.

At trial, as at the *in camera* examination, a Polish-English interpreter was on hand because Nash had an imperfect knowledge of English. However, she told the trial judge that she spoke English with less difficulty than Polish. Nash also was deaf in one ear and had undergone treatment on four occasions in a mental hospital. She had one child.

Nash testified that she lived in apartment 222 at 5023 North Winthrop on July 31, 1975, and that Seel and a man known to her as Bob were in her apartment on July 30 together with George Palcer. Nash said Palcer was near a window when the beating occurred, and that Seel knocked him down, kicked him 15 times in the head and stepped on his throat with his boot five to eight times.

Nash placed Palcer's time of arrival at the apartment at about 11 p.m. on the 30th, but on cross-examination said she did not know whether it was dark outside when he was beaten. Nash also testified that Seel and Bob carried Palcer through the apartment and threw him from the back porch, but on cross-examination she said she did not see who threw the body from the porch.

After the beating, according to Nash, the two men washed their clothes and placed them in a bag. On cross-examination she denied that she had told defense counsel in a prior conversation that Seel gave his

clothes to Bob, who removed them from the apartment. She said Seel threatened to kill her and her child if she reported the killing to police.

Nash could not estimate how long after the beating Palcer's body was removed. She said she fainted after the first stomp and at various times during cross-examination she protested that she had no idea of time because she did not wear a watch.

At trial she identified a pair of boots, dark-striped pants, and a yellow shirt as belonging to Seel.

Nash did not voluntarily report Palcer's death to the police and could not recall where she first spoke to police. The first account of the incident she gave to the police was that three black men had come to her apartment and killed Palcer. At this time she did not mention that the body was thrown from the back porch. She admitted that this first version was false, and was unable to say how long she waited before changing her story.

Nash also testified that Seel beat her on the night that Palcer died, but could not say how many times he hit her. On cross-examination she stated that a tall southern man was involved in a fight in her apartment before Palcer's beating, but later denied that such a fight had occurred. She also stated that, at the time of the beating, she was not wearing yellow pants.

Nash was also cross-examined regarding a pretrial conversation with defense counsel and two other attorneys. When asked whether she had told those attorneys that she herself had stepped on Palcer's throat, she insisted that the Polish-speaking attorney present had misunderstood her and denied making such a statement in English. She also stated that, when she demonstrated the act of stomping, she was demonstrating how Seel had done it, and not how she had behaved.

Defense counsel also asked Nash whether she had been beaten by a group of black men on the South Side of Chicago. She denied that such a beating had occurred and denied that any black men came to her apartment between 7 p.m. on July 30 and dawn on July 31, 1975.

Under cross-examination Nash admitted she had been hospitalized four times for mental problems, but said she did not recall meeting Dr. David Schutz or Judy Crivolio during these periods of hospitalization.

At the conclusion of Nash's testimony, the defense renewed its motion to have Nash declared incompetent and this motion was taken under advisement.

The defense presented Dr. David Schutz, who testified that he was the psychiatrist who oversaw Nash's treatment between December 1974 and April 1975, and saw her 30 to 50 times during this period. He characterized her behavior as childish and said she exercised poor judgment, but overall she functioned pretty well. Under stress Nash was

more likely to respond childishly than under normal circumstances, he said.

On cross-examination Dr. Schutz stated that Nash was not subject to delusions or hallucinations, although Nash had refused six months into pregnancy to accept that she was pregnant. He also stated that she did not have a history of reporting acts of violence which did not occur.

Dr. Schutz identified Judy Crivolio as one of six coordinators under his immediate supervision.

Elizabeth Farrell testified that on the night of July 30, 1975, she resided in the apartment next to 222, and that at 10:30 or 11 p.m. she saw a black man enter that apartment. Later she heard screaming, which continued until 2:30 or 3 a.m. She said the only voice she recognized was Nash's and that the others sounded like black men's voices.

On cross-examination Farrell stated that she could not describe the black man she saw and that, although the screaming continued for more than four hours, she did not complain about the noise or call the police.

Frank Rigby, who worked in Nash's building, testified that he saw Seel sleeping in the closet of Nash's apartment at the time of his arrest and that Seel was not wearing dark-striped pants at that time.

Andrew Kleczek testified that he was one of three attorneys, including defense counsel, who had a conversation with Nash before trial. He said he spoke with Nash in Polish, and that Nash told him that three black men had assaulted her on a previous occasion and that these were the same men she had initially told the police were responsible for Palcer's death. Kleczek said Nash told him she kicked Palcer in the throat and had gotten blood on her yellow pants. He admitted on cross-examination that he was not able to understand Nash's English and Polish completely, but added that she had also demonstrated how she kicked Palcer. He also said Nash told him Seel also kicked Palcer.

Dorothy Eger testified that she saw Seel leaving Nash's apartment with the police about 4:15 p.m. on July 31, 1975, and that he was wearing dark trousers and no shirt.

The defense waived closing argument. Following the prosecution's closing argument, the case was submitted to the jury, which found Seel guilty of murder. Defense motions relating to Seel's competency and for a direct verdict at the close of the prosecution's case, which had been taken under advisement, were denied. Judgment was entered upon the verdict and Seel was sentenced to a prison term of from 30 to 60 years. Seel immediately filed a notice of appeal.

Because of the nature of Seel's contentions regarding the character of Sophia Nash's testimony, the following excerpt is relevant as a representative sample of the character of that testimony:

"Mr. Queeney [Defense Counsel]: When you and I talked, we talked in English also, did we not?

Mrs. Nash: Yes, but I didn't say too good in Polish.

Mr. Queeney: The third man with myself and Mr. Falk, when I talked to you, he talked to you in Polish, didn't he?

Mrs. Nash: Yes

Mr. Queeney: And at that time and at that place, you told me and Mr. Falk in English, did you not, that you stepped on the neck and throat of George Palier two times that evening?

The witness: (Through the interpreter) Who said that?

Q: Mrs. Nash, I am asking you, Mrs. Nash, if it is not true that when you and I talked, you told me and Mr. Falk in English that you had stepped on the throat of Mr. Palcer two times? Is that true or is that not true?

A: No.

Q: You said no?

The Court: No.

Mr. Queeney: Is it not true Sophie Nash you told the man that you talked to him in Polish and you told him in Polish that you stepped on the neck of George Palcer two times?

The Witness: He didn't understand, I said no. I said no. No. I said no. Maybe he didn't understand Polish.

Q. Now Mrs. Nash, as we talked in English and in Polish, all of us used our hands and all of us demonstrated things we were talking about, isn't that true?

A. I don't understand, Why did you come to me?

Mr. Queeney: Sir I would ask the last answer be unresponsive [sic]."

We find Seel's first contention, that the trial court's refusal to allow defense counsel to participate in a *voir dire* examination of Sophia Nash amounted to a denial of due process, completely unsupported.

As authority for the proposition that a right to such participation exists, Seel relies on two Illinois decisions, *People v. Crews* (1967), 38 Ill. 2d 331, 231 N.E.2d 451, and *People v. Henson* (1975), 32 Ill. App. 3d 717, 336 N.E.2d 264. Neither of these decisions, however, recognizes such a right.

In *Crews* the witness in question was a child under 14 whose testimony was used in a post-trial sentencing hearing. The child, Jeffrey, age 4½, did not appear at the hearing, but his comments as contained in a caseworker's report were read into the record. In reviewing that procedure, the court noted that, generally, a trial court must "conduct a preliminary in-person examination of a witness of doubtful competency, such as a child, to determine competency to testify. (Citations.)" (38 Ill.

2d 331, 338.) Then, observing that the child did not appear in court and apparently was never seen by the judge, the court went on the state, "Particularly, Jeffrey should have been available for examination by counsel, as well as by the court and State's Attorney." (38 Ill. 2d 331, 338-39.) The obvious meaning of this latter statement is that the child should have testified in court and been available for cross-examination. To suggest that this language constituted establishment of a right of counsel to participate in a preliminary examination of a witness of doubtful competence is to place a tortured construction on it.

In *Henson*, the court, the State's Attorney, and the defense counsel all questioned the witness, a six-year-old child, out of the presence of the jury before she was allowed to testify, and the issue on appeal was whether the defendant was deprived of his right to a fair trial by his counsel's failure to object to the determination of the girl's competency. Before resolving that issue, the court stated:

> "Generally the trial court has a duty to conduct an in-person examination of a child to determine the competency of the child to testify. (*People v. Crews*), 38 Ill. 2d 331, 231 N.E.2d 451; *Shannon v. Swanson*, 208 Ill, 52, 69 N.E. 869; *People v. Enright*, 256 Ill. 221, 99 N.E. 936.) And defense counsel, as well as the court and the State's Attorney, should be given an opportunity to question the child to determine his competency. *People v. Crews*." 32 Ill. App. 717, 720.

To the extent that this language is susceptible of interpretation as mandating a right to *voir dire* examination, its reliance on *Crews* is, as discussed above, misplaced. Moreover, we do not view this language as reasonably susceptible to such an interpretation, because it is apparent from its reliance on *Crews* that its intended meaning was merely that, at some point, defense counsel must have an opportunity to examine such a witness. In any event, because of the facts and issue before the court in *Henson*, this language is mere dicta.

■■ Accordingly, no denial of Seel's right to due process of law resulted from refusal to permit defense counsel to participate in a preliminary examination of Sophia Nash.

Seel argues in the alternative that even if such refusal was not itself error, that refusal, when coupled with the brevity of the trial judge's *in camera* examination of Sophie Nash, caused that examination to be so deficient that the trial judge's determination of competence on such a basis constituted an abuse of discretion.

■■ Seel points out that the adequacy of a determination of competency is assessed on review with reference to a number of factors, including participation of defense counsel in a preliminary examination of the witness in question. Thus, in upholding competency determinations

reviewing courts at times refer to such participation by defense counsel as a basis for finding no abuse of discretion.(*People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1; *People v. Henson.*) However, there is no authority for the converse proposition, that failure to allow such examination constitutes error.

Seel's argument, therefore, is that the preliminary examination conducted by the trial court was defective, and that such defects as existed were not remedied or waived through participation of defense counsel. Such a proposition is dependent on a finding of defectiveness in the trial court's examination of Sophia Nash.

■■ In determining whether a witness is competent to testify, a trial court is to consider four criteria:· ability of the witness to receive correct impressions from his senses; ability to recollect these impressions; ability to understand questions and express answers; and ability to appreciate the moral duty to tell the truth. (*People v. Goble* (1976), 41 Ill. App. 3d 491, 497, 354 N.E.2d 108; *People v. Broughton* (1976), 35 Ill. App. 3d 619, 625, 342 N.E.2d 100.) However, such a determination will not be disturbed unless it amounts to an abuse of discretion or is based on a manifest misapprehension of some legal principle. *People v. Ballinger* (1967), 36 Ill. 2d 620, 622, 225 N.E.2d 10, *cert. denied* (1967), 388 U.S. 920, 18 L. Ed. 2d 1366, 87 S. Ct. 2141; *People v. Robinson* (1977), 47 Ill. App. 3d 48, 361 N.E.2d 759.

In reviewing competency determinations, reviewing courts have devoted attention to the length and depth of the preliminary examination (*People v. Dixon* (1961), 22 Ill. 2d 513, 177 N.E.2d 224, *cert. denied* (1962), 368 U.S. 1003, 7 L. Ed. 2d 542, 82 S. Ct. 637; *People v. Sims* (1969), 113 Ill. App. 2d 58, 251 N.E.2d 795), as well as scrutinizing the character of the testimony subsequently offered by the witness at trial. *People v. Tappin* (1963), 28 Ill. 2d 95, 190 N.E.2d 806; *People v. Brooks* (1976), 39 Ill. App. 3d 983, 350 N.E.2d 821; *People v. Dentley* (1975), 31 Ill. App. 3d 679, 334 N.E.2d 774.

■■ In *Dixon*, the thoroughness of a preliminary examination was considered as indicative of its sufficiency, but the converse, that brevity establishes deficiency, was rejected in *People v. Westley* (1972), 5 Ill. App. 3d 668, 284 N.E.2d 17. In *Sims*, in finding a preliminary examination deficient, the court described it as an "abbreviated inquiry," but said it "did not meet the requirements" of a competency examination. (113 Ill. App. 2d 58, 61.) Because the examination in that case elicited negative responses to such questions as whether the witness knew what would happen to him if he did not tell the truth, and did not go beyond the issue of duty to tell the truth, *Sims* stands for the proposition that an examination which does not cover the four criteria listed in. *Goble* and

*Broughton* and indicated incompetency is inadequate, not that brevity itself constitutes a deficiency.

In considering testimony produced at trial, it must be recalled that "the points to be covered in a competency hearing are rarely discernible through testimony on the trial issues" (*People v. Sims* (1969), 113 Ill. App. 2d 58, 62), and that mere inconsistencies in testimony relate only to the credibility and not the competency of the witness (*People v. Dixon*).

Accordingly, unless testimony at trial establishes that the witness did not meet the criteria for competency, that testimony cannot establish that a determination of competency constituted an abuse of discretion.

In the present case, the trial court's examination of Sophia Nash was conducted in the presence of defense counsel and featured numerous questions regarding her personal status, including questions regarding her ability to recall events on the date of the murder in question, her ability to relate those memories, her understanding of her duty to tell the truth and her awareness of circumstances of her testimony. All of these questions elicited responses indicating competency. At trial none of Nash's testimony indicated the contrary.

To be sure, her testimony, particularly at trial, featured a significant number of unresponsive statements, but in view of her hearing and speech impediments and her weaknesses in both the Polish and English languages, these do not suggest anything more than communications difficulties and possibly a degree of evasiveness. They do not suggest an inability to recall or relate events or an inability to understand the duty to tell the truth or perceive events, particularly when viewed in relation to the complex and hostile nature and form of the questions which prompted them.

■ We therefore conclude that the trial court's determination of competency did not constitute an abuse of discretion.

Seel's second contention, closely related to his first, is that Judge Romiti abused his discretion in denying defendant's motion to have Nash examined by a psychiatrist. Whether to order such an examination is within the discretion of a trial court, and the moving party must present a compelling reason for such an examination. *People v. Glover* (1971), 49 Ill. 2d 78, 273 N.E.2d 367; *People v. Dentley* (1975), 31 Ill. App. 3d 679, 681, 334 N.E.2d 774; *People v. Powell* (1973), 9 Ill. App. 3d 722, 292 N.E.2d 577.

Seel argues that medical records indicating that Nash had been hospitalized four times in a 2½-year period before and after the events in question and each time diagnosed as suffering from one form or another of schizophrenia, constituted such a compelling reason.

Notwithstanding Seel's argument that schizophrenia is defined as a

"severe psychosis characterized by various degrees of withdrawal from reality into a private, isolated world" (Moenssens, Moses & Inbau, Scientific Evidence in Criminal Cases 74 (1973), it must be remembered that sanity is not the test of competency (*People v. Enright; People v. Brooks* (1976), 39 Ill. App. 3d 983, 987, 350 N.E.2d 821). For example, testimony by a complaining witness who admitted that she had been receiving treatment for hallucinations and paranoia for eight years prior to the occurrence in question was deemed properly admitted without subjecting that witness to a prior psychological examination in *People v. Dentley*, where the defense did not introduce evidence that the witness' condition would impair her ability or willingness to tell the truth.

In the present case, the medical records produced by the defense likewise failed to establish a connection between the witness' mental problem and her ability to give competent testimony. The character of her subsequent testimony, moreover, tended to confirm that she was competent, as discussed above.

Indeed, we believe that Seel's arguments are out of place because the modern tendency regarding competency is to permit a questionable witness to testify and to allow the testimony thus produced to be attacked by impeachment. (*Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 577, 69 N.E.2d 293; *People v. Brooks.*) In the present case, not only was a separate *in camera* determination of competency made, but also the defense was permitted the additional safeguards of extensive cross-examination of the witness, wide latitude in impeachment, and production of testimony by the witness' psychiatrist regarding her mental condition and its likely effects on her testimony. Nash was cross-examined regarding the time of the beating of Palcer, what Seel did with his bloodied clothing, the color of Seel's shirt, whether she saw who threw Palcer's body off the porch, the circumstances of her initial statement to police, the substance of that statement, a prior beating she underwent at Seel's hands, and other matters. Defense counsel was permitted to question her regarding a prior conversation she had had with defense counsel and two other attorneys and to ask her whether it was true that she had told them that she had stepped on Palcer's neck.

Defense counsel was even permitted to ask her whether she had ever been beaten by three black men, although the foundation for relevance of this question was not clearly established.

Finally, the defense was permitted to present a psychiatrist who oversaw Nash's treatment and had six coordinators under him, apparently between him and his patients. This psychiatrist was permitted to describe Nash's condition and offer his opinion regarding her reliability in relating events.

■■ All of this evidence was presented for the trial judge as well as the

trier of fact to consider, together with the demeanor of the witnesses. Because the trial court, in denying the defense motion to have the witness examined by a psychiatrist, qualified his ruling with the words "at this point in time at least," and, at the close of the State's case took the defense's motion for a directed verdict under advisement, it follows that he was not persuaded by any of this evidence that his prior tentative determination of competency was incorrect and such a determination merits deference upon review. *People v. Washington* (1973), 55 Ill. 2d 521, 304 N.E.2d 276.

Moreover, the correctness of this determination is well supported by Dr. Schutz's testimony on cross-examination that Nash was not delusional or subject to hallucinations and could observe and report an incident of someone's being kicked to death, although she would have some difficulty in accurately describing an emotionally charged incident.

■ For these reasons we find that the trial court's denial of Seel's motion for a psychiatric examination was within his sound discretion.

As to Seel's next contention, that his guilt was not proved beyond a reasonable doubt, it must be recalled that all of the evidence just discussed was before the jury for consideration in determining what weight to assign to Sophia Nash's testimony, and such a determination is ordinarily for the jury (*People v. Houston* (1974), 21 Ill. App. 3d 209; 315 N.E.2d 192 *cert. denied* (1975), 420 U.S. 936, 43 L. Ed. 2d 412, 95 S. Ct. 1145; *People v. Johnson* (1970), 123 Ill. App. 2d 69; 259 N.E.2d 621), unless the evidence is so unsatisfactory as to leave a reasonable doubt of guilt. *People v. Sumner* (1969), 43 Ill. 2d 228, 252 N.E.2d 534; *People v. Houck* (1977), 50 Ill. App. 3d 274, 283, 365 N.E.2d 576, 583.

■ The core of Sophia Nash's testimony, that Seel and another man beat and stomped on Palcer, that Seel disposed of his bloodied clothes, and that he threatened to kill her and her child if she spoke to police, was plausible, consistent and unshaken. The evidence that she had told the police three black men had done the beating was plausibly explained by Seel's threat to her, as was her failure to voluntarily report Palcer's death. Her failure, when she did report the crime, to mention that Palcer had been thrown off the porch was an omission rather than an inconsistency. Although it is true that "failure to assert a fact when it would have been natural to assert it amounts in effect to an assertion of the non-existence of that fact" (*People v. Hughes* (1974), 17 Ill. App. 3d 404, 410, 308 N.E.2d 137, 141), under the facts of the present case it is doubtful that Palcer seemed alive at the time he was thrown from the porch, so that the importance of that act is not such as to make it a fact whose existence it would have been so natural to assert that its omission constitutes an inconsistency.

■ The fact that Nash first testified that Seel threw Palcer off the porch,

but on cross-examination admitted she did not see who threw Palcer off the porch is not fatal to her credibility, since even a witness without speech difficulties could reasonably be expected to overstate facts in his or her knowledge. It is highly plausible that she saw Seel take the body to the porch and heard it fall, and that she articulated this knowledge in the conclusory form that Seel had thrown the body off the porch, but when asked specifically whether she saw Seel throw the body off the porch she confined her statement to what she had actually seen.

Seel also asserts that Nash's testimony was not credible because it was inconsistent as to which details were remembered and which were not. We find it entirely plausible that a person of this witness' description would have an uneven recollection of emotionally charged events which occurred many months prior to trial.

■■ Seel's final specific point in this regard is a contention that Nash's credibility was destroyed by impeachment regarding her conversation with defense counsel and two other attorneys in which she allegedly stated that she had stepped on Palcer's neck and demonstrated to them how she had done it. We find this impeachment unconvincing because her testimony at trial that her statement at this conversation was misunderstood is at least as credible as the defense testimony that her meaning was clear. Judging from the transcript of defense counsel's cross-examination of this witness at trial, counsel's use of complex sentences framed in the negative and sudden shifts of topic, which consistently confused the witness at trial, may well have confused her during the pretrial conversation. The fact that questions and answers were also exchanged in Polish with one of the attorneys present does not provide a basis for believing that communication was any more effective in that medium. Nash stated during her *in camera* examination before the trial judge and counsel for both sides that her preferred language was English. Because the meaning of the witness' statements hinged crucially on a single pronoun—whether she meant or said "I" or "he"—we do not regard the chance of a failure of communication as small.

Finally, Seel contends that a number of minor inconsistencies and the general confusion of Nash's testimony on cross-examination destroy her credibility. The inconsistencies complained of under this contention do not directly relate to Nash's crucial testimony, and do not merit individual discussion because each is by itself without importance. Rather, it is the overall confusion of testimony which merits attention. In view of Nash's various impairments, a certain degree of confusion was to be expected in her examination under the pressure of a trial. In our view, if the confusion reflected in her testimony exceeded that degree which was to be expected, it was due in large measure to defense counsel's efforts to treat her as a normal witness and engage in the same form of verbal

pyrotechnics by which counsel traditionally shakes the testimony of adverse witnesses. If the fruits of these efforts were incoherent exchanges, we believe that that is due as much to the failure of counsel to adapt cross-examination technique to fit the witness as to weaknesses in the witness' testimony.

The decision as to which of these factors predominated in producing the confusion complained of was the jury's, in its role of determining the weight to be accorded to testimony. *People v. Houch*; *People v. Sumner*. ■■ Moreover, Seel's conviction was not based solely on Nash's testimony, but also on circumstantial evidence which tended to support her testimony as to manner, place and time of the beating, including Seel's being found in the apartment where the beating occurred sleeping in a closet. Viewed as a whole the evidence produced at trial does not leave a reasonable doubt of Seel's guilt.

The final issue raised by Seel on appeal is whether he was denied a fair trial because of two incidents of alleged prosecutorial misconduct.

The first such incident was the prosecutor's repeated references in his opening statement to Seel's presence in a closet as "hiding" and his further comments: "Well, let them tell you in their opening statement or let the defense tell you what a man's doing behind the clothes in a closet," and, "Once again, I cannot predict to you what the defense will say to you." Seel contends that this amounted to an implicit comment on the defendant's failure to testify, and thus violated constitutional and statutory protections (U.S. Const., amend. V; Ill. Rev. Stat. 1975, ch. 38, par. 155—1; *People v. Wollenberg* (1967), 37 Ill. 2d 480, 229 N.E.2d 490). We disagree.

■■ Although an argument containing a statement which reasonably could be taken as a comment on the defendant's failure to testify is improper under *United States v. Handman* (7th Cir. 1971), 447 F.2d 853, we do not regard this statement as reasonably susceptible of such an interpretation. In *Handman* the vague reference was in a closing statement. In such a situation the jury had already become aware of the defendant's failure to testify, so that an implied comment on that failure could be more easily conveyed. Here, the statement in question occurred before the jury was aware that the defendant would not testify and, because it was addressed to the defense rather than the defendant as a challenge to explain incriminating circumstances, it would not be reasonable to take it as a comment on the defendant's failure to testify.

The second incident of alleged prosecutorial misconduct was the prosecutor's remark to Dr. Schutz, after asking him a question and being told by him that it was hard to answer "yes or no," "Try and answer as best you can, as long as it's honestly." A defense objection to this comment was sustained, but Seel contends that it constituted a suggestion

that Dr. Schutz was lying, and thereby caused prejudicial error to the defense because it weakened the impact of Dr. Schutz' testimony impeaching Nash's capacity to provide credible testimony.

As stated above, Dr. Schutz' testimony was not very damaging as to Nash's abilities. Even if fully credited, his testimony would not have precluded the jury from believing her account of the crime. Accordingly, any unfair attack on Dr. Schutz' credibility would merely have further weakened an already weak link in the defendant's case and could not have affected the jury's verdict, and therefore would not constitute grounds for reversal. *People v. Franklin* (1976), 42 Ill. App. 3d 408, 356 N.E.2d 634.

■■ In any event, the prosecutor's comment in this case was not necessarily even technical error, because his admonition, "so long as it's honestly," does not appear to convey skepticism regarding Dr. Schutz' veracity. Faced with a witness who was reluctant to give a "yes" or "no" answer, the prosecutor was confronted with the choice of insisting on such an answer regardless of how misleading the witness felt such an answer would be, dropping the question, or encouraging the witness to try to answer with a "yes" or a "no," if that was possible. The first course would make him and his question appear unreasonable to the jury, and the second would constitute a concession. Here, the prosecutor obviously chose the third course, and added an admonishing phrase. In that context the phrase in question is at least as susceptible to the interpretation that he meant, "if an answer of that sort would be honest," as to the interpretation that it was a gratuitous editorialization on the witness' honesty.

Even if an improper meaning were intended or conveyed to the jury, under the facts of the present case Judge Romiti's sustaining of defense counsel's objection to this remark would have cured this error. *People v. Martinez* (1978), 62 Ill. App. 3d 7, 377 N.E.2d 1222.

For the foregoing reasons, the grounds asserted by the defendant for reversal must be rejected. The judgment of conviction against Donald Seel is hereby affirmed.

Affirmed.

McGLOON and McGILLICUDDY, JJ., concur.