THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* REGINALD HUGHES, Defendant-Appellant.

(No. 57687;

First District (1st Division)—January 28, 1974.

Jeffrey H. Haas and Andrea-Marie Monsees, both of Chicago, and Susan B. Jordan and Donald J. Stang, both of San Francisco, California, for appellant, with assistance by Patricia Handlin and Ralph Hurvitz, both of Chicago.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Thomas A. Mauet, Assistant State's Attorneys, and Nicholas P. Iavarone, Senior Law Student, of counsel), for the People.

Mr. JUSTICE BURKE delivered the opinion of the court:

The defendant was found guilty by a jury of the offenses of voluntary manslaughter and murder and was sentenced to a term of fourteen years to fourteen years and a day on the murder charge. No sentence was imposed for voluntary manslaughter. He was acquitted of a charge of aggravated battery.

On the evening of August 13, 1971, the defendant and Michael Winston left the Hughes home at 10631 South Cottage Grove in Chicago to purchase beer at a neighborhood tavern on 107th Street between Cottage and Champlain. While there, they were observed by Kathy Kearns and Diane Schultz. The girls informed their boy friends, Bob Morin and Pat Blosser, that Michael Winston had grabbed Kathy and spoken to her and Diane. The four then followed the defendant and Michael down 107th to Cottage. The defendant and Michael had turned the corner of Cottage and 107th and were about four houses from the Hughes home, which was seven doors from 107th, when they were hailed by Bob Morin. The two returned to the corner. After some conversation, a fight began. Bob Morin testified that the defendant pulled a knife during the fight and cut Morin on the arm. When people from the tavern started toward the fracas, the defendant and Michael ran. The defendant was pursued by Maurice Danaher, who testified that the defendant turned on him and threatened him with a knife. The defendant claimed he had no knife. Danaher returned to the tavern, and, while he was there, he saw three black men pass the open door, heading down 107th toward Champlain. Danaher testified that one of the men was the defendant, who was carrying a piece of lumber. Danaher stated that he then went

outside the tavern and saw the defendant strike John Kashen from behind with a board. John Kashen died of head wounds the following day.

Maurice Danaher testified that he emerged from the tavern and saw Bob Morin and the defendant fighting at the corner of 107th and Cottage, which was about 40-50 feet away. He stated that he shouted at the fighters. He said there was no one between him and the fight, and that she saw only two men fighting, the defendant and Morin. He chased the defendant but failed to catch him. He estimated he was about two feet from the defendant when the defendant pulled the knife on him. When he saw the defendant later as he passed the tavern, Danaher said the defendant carried a 2" by 6" board, approximately three to four feet long. Danaher went out and saw the defendant hit Kashen. He thought he observed two other men in the background. He said the lighting was not too good on the corner. Danaher and another man ran to the scene. The other man dodged a blow from the defendant, while Danaher wrested the board from the defendant, who ran away. On cross-examination Danaher stated that he could remember nothing about the two men who walked past the tavern with the defendant. Nor could he be sure the two at the scene of Kashen's assault were the same men who walked past the tavern with the defendant. He was sure that the one who struck Kashen was hatless. He described the assailant to the police as a tall, black man, wearing a white T-shirt. Although at trial he said he saw the defendant's face when he passed the tavern, Danaher admitted that at a pretrial hearing he was not sure he saw the face, that he identified the man by means of his clothing, specifically the white T-shirt. Danaher indicated he had doubts as to his identification of the defendant in a line-up held on September 2, 1971. On recross-examination he stated that his doubts centered on the length of the defendant's hair, which Danaher thought looked shorter on the day of the line-up than on the day Kashen was struck.

The next witness was Diane Schultz, who testified that after the fight she left Kathy Kearns in front of Kathy's house and proceeded to speak to a police officer who was parked on Champlain near 107th. At 9:30 P.M. Pat Blosser drove up to Kathy's house with Bob Morin. They had gone to clean Bob's wound. Pat let Bob out of the car and Diane entered the car. Diane did not see anyone near the corner of 107th and Champlain at this time. Pat and Diane drove off, but they returned to the area at about 10:30 P.M. Diane said they saw a paddy wagon in front of the Kashens' house and stopped there. They met Kathy, who told them only that Kashen had been hit, making no mention of the one who did it.

Bob Morin testified that he identified the defendant as the same man he fought with at the corner of 107th and Cottage Grove. He stated that he saw the defendant pull a knife and strike him in the forearm. He also said that after Pat dropped him off near Kathy's house, he went inside for about twenty minutes; then he went to the hospital for treatment of his arm.

Pat Blosser testified that he was among those who chased the defendant from the fight, and that he dropped Bob off at Kathy's at 9:30 P.M. He said he drove Bob to the hospital at about 10:30 P.M. and that Diane went with them.

Kathy Kearns testified that she lived at 10658 South Champlain, Chicago, Illinois. She stated that she and Diane went to her house after the fight and that both girls talked to the policeman, who she stated was parked on 107th near the tavern. She testified that she left Diane and the policeman to walk to the corner of 107th and Champlain to speak to John Kashen. While she talked to him he was hit from behind by the man she identified as the defendant. Kathy said she then went home and John entered his house. Kathy's father called the police and Bob went to the hospital.

On September 2, 1971, Kathy identified the defendant after viewing a line-up on two occasions. On the second occasion, she asked that the defendant be required to speak, though there was no evidence that the man who struck Kashen said anything. Kathy knew the defendant from the neighborhood and knew where he lived.

Deborah Hughes, the defendant's sister, testified that on the night in question the defendant was wearing a blue shirt and dark pants, while both Michael and Lawrence Winston were wearing white T-shirts and dark pants. After the fight Mrs. Winston came to the Hughes home, and Deborah testified that Mrs. Winston, Deborah and Denise Hughes then walked toward 107th, where they were harassed by white boys. Deborah said that Mrs. Winston pulled a gun and threatened the white people. Michael and Lawrence arrived and struggled for the gun. The white boys fled, and the others started toward Champlain on 107th. At the corner of Champlain and 107th, they encountered a man knocking on a door. Michael and the man exchanged words. Then, Deborah testified, she saw Lawrence Winston hit the man on the head with a board. She described Lawrence Winston as about 5' 9" or taller, red-haired and husky.

Mrs. Katonia Kunz, who lived in the neighborhood, testified that she walked to the southeast corner of 107th and Champlain at about 10:00 P.M. on August 13, 1971. She saw five people, three black men and two black women, coming down 107th toward Champlain. They

hesitated at the tavern in the middle of the block and continued on to the northwest corner of the intersection. Mrs. Kunz saw that one of the men had a board. He turned quickly and "he came down." She did not see John Kashen before he was hit. Afterwards, she saw the man who was hit get up and grope to his door, where someone helped him inside. She said the killer was larger and taller than the other two black men, and that he was wearing a small hat and a white T-shirt. She testified that the killer was stockier than the defendant and bigger in the chest. She saw no white people on the corner other than the man who was hit. Her vantage point was about 60 feet from the scene of the murder.

The defendant testified that he returned home from playing basketball with Michael and Lawrence Winston. Lawrence was sent to buy hamburgers while Michael and the defendant went to buy beer. Returning from the tavern, they responded to a call by two white boys and two white girls at the corner of 107th and Cottage Grove. They returned to the corner. The defendant stated that Bob went to kick at him and they started tussling. He said that Kathy Kearns grabbed him from the rear. He also stated that Michael threw beer bottles at Bob and Pat, though the latter testified that the defendant was the first to throw a bottle. After he got Bob on the ground, the defendant noticed Maurice Danaher running from the tavern with others behind him. The defendant ran north on Cottage Grove. When he saw other blacks coming toward him to help, the defendant turned around and his pursuers retreated. He testified he never had anything in his hand and that he did not have a knife. Mrs. Winston arrived at the Hughes home about one-half hour after the defendant returned. She and the defendant's sisters, Deborah and Denise, left the house and walked up to 107th. Mrs. Winston is short and stout and was wearing a scarf wrapped around her short hair. When the defendant heard Deborah call out, he and Michael ran to the corner of 107th and Cottage Grove, where Lawrence was wrestling with his mother for a gun she held. After this, they went east on 107th toward Champlain. The defendant stated that near that corner a man called Michael a nigger. He said that Lawrence hit the man with a board while the defendant was restraining Michael. The defendant stated that he saw no one on Champlain at this time, and that Kathy Kearns was not there. He said the blow to Kashen took the defendant by surprise. He described Michael Winston as 5' 11" tall, husky, wearing dark pants and a white T-shirt. Lawrence Winston was described as 6' 1", huskier than Michael and the defendant, and the only one wearing a hat. The defendant stayed at home with his mother than night and went the next day, as he frequently did, to stay at his father's home.

Mrs. Winston testified that she went to the Hughes home when she

learned of the fight. Walking with Deborah on 107th Street, she was harassed by white boys. Deborah called to Michael and the defendant for help. Lawrence joined them. The whites chased the women, the black men arrived and a large fight ensued. She testified that Michael and the defendant had sticks, but Lawrence did not. She did not see John Kashen struck. She denied having a gun.

Lawrence Winston testified that he did not strike John Kashen, nor did he see him struck. He testified that he was not involved in any fight that night, and that his mother did not have a gun. When he, his mother, Michael and the defendant were "cornered" by white people, they broke and ran.

Officer O'Connor a Chicago policeman, testified that the defendant told him he killed no one.

Barbara Hughes, the defendant's mother, testified that the defendant was present at the second fight then evening, but he did not participate. She also stated that Lawrence Winston was the only one of the three (Lawrence, Michael and the defendant) wearing a hat on the evening in question.

Other witnesses testified to the defendant's character for non-violence.

■■ The first argument raised by the defendant is that he was not proved guilty beyond a reasonable doubt. The two witnesses who claimed to have seen the defendant strike John Kashen were Kathy Kearns and Maurice Danaher. While a determination of the credibility of witnesses is normally the province of the jury, we find that the testimony of these two witnesses itself undermines their credibility and raises a reasonable doubt of the defendant's guilt.

While Kathy's belief that the defendant slashed her boy friend might have prompted the identification of the defendant as the one who murderd John Kashen, we find there are more substantial reasons for doubting her testimony. She claimed to be an eyewitness to the incident, yet no one saw her on the corner at that time, and two other eyewitnesses, Maurice Danaher and Katonia Kunz, testified that no one of her description was there. The defendant also testified that she was not present. Kathy testified that she and Diane talked with a policeman, but Diane testified that Kathy did not do so. Kathy testified that there was no one on the corner of 107th and Cottage Grove when she went to speak to John Kashen. But she had previously stated that there was a group of boys heading toward her and Kashen from that corner and that Kashen had come out to see if she were all right. Further, she testified that she left Diane and the policeman to speak to Kashen and that he was struck very soon after she reached him. Kathy was unaware of what happened to Diane and the policeman, but Diane testified that Pat

picked her up, at which time there was no one on the corner of 107th and Champlain. Hence, at the place where Kathy, according to her testimony, should have been clearly visible to Pat, Diane and Bob, they saw no one. In addition, Kathy placed the police car at a spot different from where Diane said it was, in fact on a different street.

Critical to the credibility of Kathy's testimony is that manner in which she came to identify the defendant. She knew who he was and where he lived, yet she did not even tell the police that night that she had seen John Kashen hit. Nor did she tell her friends, whom she met shortly after the incident, that she witnessed it, or that the defendant was responsible, even though her friends had seen the defendant at the first fight. As this court has said:

> "It is a general principle of evidence that the failure to assert a fact when it would have been natural to assert it amounts in effect to an assertion of the non-existence of that fact. [Citation.] The omission, that is, the failure to assert a fact, is *prima facie* inconsistent conduct which unexplained has the tendency to discredit a witness." *People v. King*, 10 Ill.App.3d 652, 655, 295 N.E.2d 258, 260.

Finally, Kathy required two opportunities for observation of the defendant at a line-up, even though she knew who the defendant was. At the second viewing, she requested that the defendant be asked to speak, although there was no testimony that the murderer spoke. A conviction which rests on an identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt, will be reversed. *People v. Cullotta*, 32 Ill.2d 502, 270 N.E.2d 444.

The other witness who identified the defendant as the murderer was Maurice Danaher. His testimony, too, is subject to skepticism upon close scrutiny. He first saw the defendant from a distance of 40 to 50 feet, during the fight with Bob Morin. While his identification of the defendant then is not subject to question, in light of testimony establishing the defendant's presence at the fight, Danaher's identification of the defendant as John Kashen's murderer is not so clearly established. Danaher contradicted himself when he said he saw the defendant's face as he passed the tavern door and later admitted that he identified him by his clothes, particularly the white T-shirt. He admitted that the lighting on the corner of 107th and Champlain was not good. He testified that he saw only the defendant in the corner with Kashen. Then he conceded that he might have seen two other black men, who may or may not have been the same two who passed the tavern with the defendant. He could remember nothing of the appearance of these two. He identified the

murderer as a tall black man, wearing a white T-shirt and dark pants, but he failed to mention that he was the same one who participated in the earlier fight. Finally, he was uncertain of his line-up identification of the defendant, blaming his uncertainty on the length of the defendant's hair. With respect to the question of hair length, the State had the following exchange with Danaher:

"Q. Mr. Witness, I will show you what has been marked now as People's Exhibit No. 7, which is a photostatic copy of a mail card, and ask you to look at that photograph of Reginald Hughes as he was admitted into the jail on September 2nd, 1971, and tell the Court and jury whether or not the hair [sic] still reasonably comports with the style that you saw strike and kill [sic] John Kashen on August 13, 1971?

A. Yes.

Q. And that hair still is more longer, or similar to the person that you saw on August 13, 1971, than does the defendant as he sits here now?

A. Yes."

This discussion was an apparent attempt by the State to clarify the question of whether Danaher, in spite of doubts at the line-up, could positively identify the defendant as the murderer. The confused phrasing of the questions, however, adds to the uncertainty that this witness could accurately and with conviction name the defendant as the killer. Indeed, the exchange between Danaher and the State's attorney indicates that the defendant's hair was longer on the day the picture was taken than it was at trial. The line-up was held on the same day the picture was taken and there was no testimony that a haircut was given between the times of the picture and the line-up.

■■  "In a criminal case it is incumbent upon the prosecution to prove beyond a reasonable doubt not only the commission of the crime charged but also its perpetration by the accused." (*People v. McGee*, 21 Ill.2d 440, 444, 173 N.E.2d 434, 436.) On the record before us, where the identification testimony as discussed does not produce an abiding conviction of guilt, and where the defendant's story is not incredible but is supported by other testimony, particularly that of a disinterested eyewitness (Katonia Kunz), we are compelled to reverse the judgment. Having thus disposed of this case, there is no necessity to treat the defendant's other arguments on appeal.

Judgment reversed.

GOLDBERG and HALLETT, JJ., concur.