FOURTH DIVISION

No. 1-08-2068

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | No. 04 CR 9640 |
| KEITH WILCOX, | ) | |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brian Flaherty, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE GALLAGHER delivered the opinion of the court:

Following a jury trial, defendant Keith Wilcox was found guilty of first degree murder and aggravated unlawful restraint and was sentenced, respectively, to concurrent terms of 50 and 5 years' imprisonment. On appeal, defendant contends that the State failed to prove him guilty of first degree murder beyond a reasonable doubt and that he was denied the effective assistance of counsel. Defendant also contends that the trial court erred by coercing the jury into returning a verdict, failing to admit an out-of-court statement made by a State witness into evidence, failing to grant the defense's motion for mistrial, admitting evidence of his flight, and improperly considering factors in aggravation and mitigation during sentencing. We reverse and remand.

BACKGROUND

Defendant was charged with three counts of first degree murder for shooting and killing Gerald Cross and one count of aggravated unlawful restraint for detaining Cameron Brefford while armed with a deadly weapon. Defendant allegedly committed these offenses on November

1-08-2068

23, 1997.

Prior to trial, the State filed a motion to bar the testimony of Quincy Page as to an out-of-court statement in which Mohammed Williams allegedly admitted to shooting Cross. The State asserted that the testimony was inadmissible hearsay and that there were insufficient indicia of the statement's trustworthiness for it to fall within the exception to the hearsay rule created by the United States Supreme Court in Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973). Defendant filed a response, in which he asserted that the necessary indicia of trustworthiness were present because Page and Williams knew each other well, Williams made his inculpatory statement on the evening of the shooting, the statement was corroborated by other evidence, and Williams would be available for cross-examination. Following argument, the trial court initially denied the State's motion, but later revisited the issue and granted the motion, finding that Williams' statement was not admissible under Chambers because it was not corroborated by any independent evidence.

At trial, Cameron Brefford testified that about 12:30 p.m. on November 23, 1997, he drove his girlfriend's car to a house in Harvey Illinois, where he visited his friend Gerald Cross. Muhammad Williams was at the house when Brefford arrived, and Cross asked Brefford to help him sell a video game. Brefford drove Cross and Williams to a house on Kinney Road in Robbins, Illinois, where they attempted to sell defendant the game. Defendant asked Brefford to take him to a different part of Robbins to get money. Brefford drove defendant, Cross, and Williams to two locations, but defendant was unable to get the money, and they returned to the house on Kinney Road. After the game was returned, Brefford drove Cross and Williams to their

-2-

1-08-2068

respective homes.

Brefford then picked up his girlfriend, Wendy Rollins, and drove her to a trailer park in Robbins, where they arrived at about 5:20 p.m. Brefford parked the car in front of Rollins' friend's trailer, and the two separated to visit different friends. Brefford returned to the car after he had finished visiting his friend and saw that defendant was talking loudly with Rollins near the vehicle. Defendant asked Brefford if he had left his wallet in the car and searched Brefford, but did not find anything. Defendant asked Brefford who had been in the car that day and where he had been, and Brefford responded that the only other people that had been in the car that day were Cross and Williams. Defendant pulled a gun out of his pocket and Brefford tried to run away, but defendant told him to stop or he would shoot and he "would come down and kill all of us." Brefford stopped running and defendant put the gun back in his pocket and pointed it at Brefford through his clothes. The two men walked back to the car while defendant continued to point his gun at Brefford through his clothes, and Brefford obtained the car keys from Rollins. Brefford and defendant entered the car and drove away to see if defendant's wallet was at Cross's or Williams' house.

As they were driving, Brefford ran a red light and defendant told him not to do that again because "[i]f he was going to go to jail, he might as well go for murder [and] not just catch a gun case." When they arrived at Cross's house, Brefford told Cross that defendant had a gun and was looking for his wallet, and that Cross should return the wallet if he had it because defendant was talking about killing him. Cross said that he did not have defendant's wallet, but that he was looking for Williams because he had stolen some things from his house earlier in the day. Cross

-3-

went inside and got his hoodie, and all three men entered the car and proceeded to Williams' house at 158th and Paulina in Harvey.

When Williams opened the door at his house, defendant asked him if he had his wallet, and Williams responded that he did not. Defendant, Williams, Brefford, and Cross then walked from the front door to Rollins' car after the owner of Williams' residence asked them to do so because her neighbor was a police officer. When they arrived at the car, Cross grabbed Brefford by the collar, asked him why he had brought defendant to his residence, and struck him three times. Brefford then heard a gunshot and Cross let go of him. As Brefford ran away, he looked back and saw defendant standing over Cross, who was lying on the ground. Defendant unloaded his clip into Cross, and Brefford heard six or seven gunshots as he did so. Brefford explained that he believed that the bullet from the first shot had traveled past his ear.

After running for a couple of blocks, Brefford stopped at a house and used the phone to call 911. The police took Brefford to the scene of the shooting that night, and he told the officer that he did not want to speak about the shooting because "there was a killer on the loose" and there were a lot of people standing around that area. Some time later, Brefford viewed a number of mug shots at a police station and picked out a picture of defendant and identified him as the man who had shot Cross.

On cross-examination, Brefford stated that when he was at the trailer park, he returned to Rollins' car because he heard shouting coming from that area and that he was about four feet away from her when defendant pulled a gun on him. Brefford also stated that Cross did not push him up against a car when he grabbed him by the collar and shook him. In addition, when

-4-

defendant first shot Cross, Williams was standing off to the side, defendant was standing behind Cross, and Brefford was the only person facing Cross.

Muhammad Williams testified that he had been good friends with Cross and defendant and that on November 23, 1997, he and Cross had decided to try and sell one of Cross's video games to defendant. Brefford picked up Williams and Cross and drove them to defendant's house, but they were unable to complete the sale. Brefford then drove Cross to his home and dropped Williams off at his friend Jackie's house. About an hour later, defendant arrived at Jackie's house with Quincy Page and asked Williams if he had seen his wallet. Williams responded that he had not, and defendant asked him if he knew where Cross lived. Although Williams knew where Cross lived, he told defendant that he did not because defendant was acting "too tense *** too eager."

Defendant returned to Jackie's house about two hours later with Brefford and Cross, and Williams went on the porch to speak with them. After they moved off the porch at Jackie's request, defendant told Brefford to tell Williams what he had told him. Brefford said something, and Cross grabbed hold of Brefford and started hitting him, "[t]rying to shut him up." After about two minutes, defendant pulled a 9-millimeter semiautomatic pistol out of his pocket and shot Cross from about two feet away. Cross tensed up and made a quick move to the right, and defendant shot him again, causing him to fall on his back. Defendant then stepped over Cross and fired the gun at him at least 10 times. Williams ran away and did not go to the police because he was afraid and wanted nothing to do with the shooting. Some time later, Williams spoke with Harvey police detective Billy Martin and testified in front of a grand jury regarding

1-08-2068

the shooting.

On cross-examination, Williams stated that he did not mention Page when he testified before a grand jury in January 1998 or in the signed statement he provided Harvey police on December 1, 1997, and he explained that he did not mention Page because he thought he was irrelevant to the murder. Williams also stated that Cross pushed Brefford up against a car when he grabbed him outside of Jackie's house. When Cross did so, Williams was standing to the left of Cross and defendant was standing to the left of Williams. Defendant reached across Williams and shot Cross on the left side of his torso, and Cross tensed up, raised his shoulder, and grabbed himself around the belt buckle. Although Williams saw defendant point his gun at Cross and fire the second shot, he did not see where on Cross's body defendant had shot him. Williams stated that he did not see defendant pull the gun out of his pocket prior to shooting Cross, but acknowledged that he testified before the grand jury that he did see defendant pull the gun out of his pocket. Although Williams did not actually see defendant pull the gun out of his pocket, he had seen the imprint of the gun in his pocket prior to the shooting.

Wendy Rollins testified that about 5:30 p.m. on November 23, 1997, Brefford picked her up from work in her car and drove to a trailer park in Robbins, where they separated to visit different trailers. While she was at the trailer park, a man with brown skin, "a low bald face," and a little hair on the top of his head approached her and asked her if she had let anyone drive her car that day. Rollins responded that she had, and the man then asked if he could look in the car for his wallet. The man seemed agitated and angry, and she allowed him to look in her car. The man did not find anything in Rollins' car and then asked her if she knew where Brefford

was, and she responded that she did not. While Rollins and the man were talking, Brefford appeared from a couple of trailers down and was walking toward them before he turned to run away. The man told Brefford not to run and approached him. Brefford spoke with the man and they returned to the car, walking shoulder to shoulder. Brefford, who seemed nervous and jittery, asked Rollins for the keys to the car. Rollins handed Brefford the keys, and he and the other man entered the car and drove away. On cross-examination, Rollins stated that she did not observe the man make any threats to Brefford or pull out a gun.

Scott Bakken, a FBI fugitive task force agent stationed in Las Vegas, Nevada, testified that on March 11, 2004, he conducted a raid on a house to locate and apprehend defendant based on an arrest warrant from Harvey, Illinois. Upon arrival, the task force officers knocked on the doors and windows of the house for about five minutes until defendant responded and asked who they were and what they wanted. Agent Bakken said that they were the FBI and wanted to speak to the occupants of the house. Defendant responded that his name was Dajuan and that he did not want to come to the door. About 15 minutes later, defendant, another man, and two children emerged from the back of the house. Defendant told Agent Bakken that his name was Dajuan Walker and produced an Ohio identification card and Cook County Hospital birth certificate to that effect. Agent Bakken took defendant into custody and asked him if his name was Keith Wilcox, and defendant responded that his name was Dajuan Walker. Defendant was then transported to the FBI office, where he identified himself as Keith Wilcox just before Agent Bakken fingerprinted him.

Dr. John Ralston, an assistant medical examiner for the office of the medical examiner of

Cook County, testified that he reviewed the reports prepared by Dr. Brian Mitchell of the autopsy he performed on Cross's body in November 1997. Those reports reflected that Cross sustained seven gunshot wounds: the first showed that Cross was shot on the right side of the upper chest at the point of connection between the arm and the shoulder and that the bullet traveled through the middle and lower lobes of the right lung and the liver; the second showed that he was shot on the left side of the chest and that the bullet traveled through the lower lobe of the left lung before exiting his through his back; the third showed that he was shot on the left side of the chest and that the bullet traveled through the spleen before exiting through his back; the fourth showed that he was shot on the lower part of the left side of the chest and that the bullet lacerated the left kidney; the fifth showed that he was shot at the base of his right hand on the palm side and that the bullet lodged in the bone; the sixth showed that he was shot at the front side of his left elbow and that the bullet exited through the back of the arm; and the seventh showed that he sustained a graze wound on the left side of his head. The reports further showed that there was no evidence on the surface of Cross's skin of close-range firing, which is usually present if the gunshot occurred within three feet of the body.

On cross-examination, Dr. Ralston stated that the records reflected that each of the four gunshot wounds that Cross sustained to his chest was caused by a bullet that entered through the front of his body and that none of the wounds sustained by Cross were caused by bullets entering directly through either of his sides. Dr. Ralston further stated that although evidence of close-range firing will generally be found on a body if the gun was fired within two to three feet, such evidence may not be present on a body if the victim was wearing heavy clothing.

Defendant testified that he moved from Robbins to Columbus, Ohio, on November 15, 1997, eight days before the shooting of Cross, because he was offered a job at a steel mill in Columbus by his girlfriend's cousin. Although defendant did not get the job at the steel mill, he remained in Columbus for three years with his girlfriend and their children and worked as a mechanic. Around May 2000, defendant and his family moved to Las Vegas.

On cross-examination, defendant stated that he had obtained an identification card under the name of Dajuan Walker, his girlfriend's brother, while in Columbus because there was a rumor that the police had wanted him for questioning. Walker had told defendant that Robbins police officers had stopped by his house on Kinney Road and asked him if defendant was there. Although the officers did not tell Walker what they wanted to question him about, defendant believed that they wanted to question him because he had violated his "I-Bond" in connection with his arrest for criminal trespass in Robbins on November 7, 1997. Defendant told his employer in Las Vegas that his name was Dajuan Walker because he thought that his employer might run a background check on him. When defendant was arrested in Las Vegas, he told the FBI officers that his name was Keith Wilcox, and not Dajuan Walker. Defendant further stated that although he knew Williams as a gang banger from his neighborhood, he had never before seen Brefford.

On this evidence, the jury found defendant guilty of first degree murder and aggravated unlawful restraint. Following a hearing, the trial court sentenced him to 50 years' imprisonment for first degree murder and 5 years' imprisonment for aggravated unlawful restraint, to be served concurrently.

ANALYSIS

I. Sufficiency of the Evidence

In this appeal, defendant first contends that the State failed to prove him guilty of first degree murder beyond a reasonable doubt. Where a defendant challenges the sufficiency of the evidence to sustain a conviction, the standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Hall, 194 Ill. 2d 304, 330 (2000). This standard recognizes the responsibility of the jury to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences therefrom. People v. Campbell, 146 Ill. 2d 363, 375 (1992). This court will only reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. People v. Ross, 229 Ill. 2d 255, 272 (2008).

Defendant asserts that the evidence was insufficient to prove him guilty of first degree murder beyond a reasonable doubt because the eyewitness testimony of Brefford and Williams was unreliable. Defendant first maintains that the testimony of Brefford and Williams is unbelievable because neither of them immediately informed the police that defendant shot Cross, which would have been the reasonable course of action for persons who had witnessed the shooting of one of their friends.

We initially note that it is unclear from the record exactly when Brefford and Williams first identified defendant as the shooter. Brefford testified that he did not want to speak about the shooting with the police at the scene of the crime because "there was a killer on the loose" and

there were a lot of people standing around that area and that he later identified defendant as the shooter after viewing mug shots at the police station. Williams testified that he ran away from the scene of the crime and did not immediately go to the police because he was afraid and wanted nothing to do with the shooting. The delay in identifying defendant as the shooter by Brefford and Williams affects the weight to be given to their testimony, which is to be determined by the jury, and we determine that in this case they each provided the jury with understandable reasons for failing immediately to identify defendant as the shooter. People v. Yates, 65 Ill. App. 3d 60, 62 (1978).

In reaching that determination, we have considered People v. Charleston, 47 Ill. 2d 19 (1970), and People v. Hughes, 17 Ill. App. 3d 404 (1974), cited by defendant, and find them distinguishable from this case. In Charleston, 47 Ill. 2d at 20-22, our supreme court held that the evidence was insufficient to prove the defendant guilty where the prosecuting witness concealed the identity of her assailant for almost a week, she was the only witness to identify the defendant as the offender, and the defendant's alibi testimony was corroborated by two other witnesses. In Hughes, 17 Ill. App. 3d at 410-11, this court held that the evidence was insufficient to prove the defendant guilty where the defendant's theory of the case was supported by the testimony of other witnesses and the credibility of the State's two eyewitnesses was brought into doubt. In doing so, this court determined that one of the eyewitnesses' identifications was doubtful because other witnesses had testified that she was not present at the scene of the crime, she failed to immediately tell the police or her friends that she had witnessed the crime, and she required two opportunities to view the defendant in a lineup and requested that he speak before identifying

him even though she knew him and there was no evidence that the offender spoke during the commission of the crime. Hughes, 17 Ill. App. 3d at 409-10. In this case, however, Brefford and Williams provided understandable reasons for not immediately identifying defendant, defendant's alibi testimony was not corroborated by that of other witnesses, and the presence of Brefford and Williams at the shooting has not been brought into doubt.

Defendant, citing People v. Smith, 185 Ill. 2d 532 (1999), next maintains that no reasonable jury could have believed the testimony of Brefford and Williams because they each had reasons to shoot Cross and fabricate their testimony. Defendant asserts that Brefford had reason to shoot Cross in self-defense and that Williams had a motive to shoot Cross because he had accused Williams of stealing from him.

In Smith, 185 Ill. 2d at 542-45, our supreme court held that the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt where the sole eyewitness to identify the defendant as the offender had a motive to falsely implicate the defendant to exonerate her sister's boyfriend, who was a possible suspect, and her testimony was contradicted in important respects by the testimony of the State's more reliable witnesses. Unlike in Smith, 185 Ill. 2d at 541, where the defendant presented evidence that the police had been harassing the sole eyewitness' sister and accusing her of having been involved in the shooting, there is no evidence in this case that Brefford or Williams had reason to believe that either of them was suspected of being the shooter. In addition, although defendant sets forth possible motives Brefford and Williams could have had to shoot Cross, the jury was not unreasonable in failing to infer those motives from the evidence presented.

Defendant next maintains that the testimony of Brefford and Williams was unbelievable because it was contradicted by the autopsy reports. Defendant first alleges that the autopsy evidence showing that all four of the bullets that entered Cross's chest traveled from the front of his body to the back and that none of the bullets entered Cross's body directly through his side. Defendant asserts this contradicted the testimony by Brefford and Williams that defendant first shot Cross by reaching around Williams and shooting him in the side and that Brefford was the only person facing Cross at that time.

While the autopsy reports showed that Cross did not sustain any gunshot wounds directly in his side, they did show that he sustained three gunshot wounds to the left side of his chest and one to his left arm. In addition, although Williams testified that defendant reached around him to shoot Cross, he did not testify as to the angle at which the gun was pointed at Cross when he fired. Thus, it would not have been unreasonable for the jury to determine that the first shot fired by defendant caused one of the wounds to the left side of Cross's chest or his arm.

Defendant also alleges that the lack of evidence of close-range firing on Cross's skin contradicted the testimony that defendant first shot Cross from about two feet away. Dr. Ralston explained, however, that evidence of close-range firing may not be present on a victim's body if he was wearing heavy clothing when he was shot. Brefford testified that Cross had grabbed his hoodie prior to going to the scene of the shooting, and the photographic evidence shows that Cross was wearing a heavy jacket when he was shot. Thus, the State provided a reasonable explanation for why there was no evidence of close-range firing on Cross's body.

Defendant further maintains that the testimony of Brefford and Williams could not have

been believed because it was inconsistent and impeached on key matters. Defendant asserts that Williams was impeached with prior inconsistent statements because he testified that defendant arrived at Jackie's house with Page on the afternoon of the shooting and that he did not see defendant pull the gun out of his pocket just before he shot Cross, but did not mention Page in his signed statement or grand jury testimony and testified in front of the grand jury that he did see defendant pull his gun out of his pocket. However, Williams adequately explained that he did not mention Page prior to testifying because he did not think that information was relevant and that he inferred that defendant had pulled the gun out of his pocket because he had seen the imprint of the gun in his pocket prior to the shooting.

Defendant points out that although Brefford testified that defendant threatened him with a gun at the trailer park, Rollins testified that she did not see the man at the trailer park pull out a gun, and that although Williams testified that Cross pushed Brefford up against a car as they struggled, Brefford testified that Cross did not push him up against a car. These conflicts, however, are relatively minor, and some conflicting testimony is to be expected any time multiple people witness events under traumatic circumstances. People v. Brooks, 187 Ill. 2d 91, 133 (1999). In addition, although defendant asserts that the testimony that defendant found Brefford and Rollins at the trailer park and that Cross attacked Brefford in front of Jackie's house instead of at his home was contrary to reason and inherently unbelievable, the believability of the witnesses was a determination to be made by the jury.

We agree with defendant that the failure of Brefford and Williams to identify defendant as the shooter immediately after the shooting, the arguable conflicts between their testimony and

the autopsy evidence, and the inconsistencies between their own testimony affect their credibility and the weight to be given to their testimony.  In addition, we note that their credibility was also affected by their inconsistent testimony regarding where defendant was standing when he first shot Cross.

However, the testimony of Brefford and Williams was largely consistent as to the sequence of events leading up to and including the shooting.  Both witnesses testified that Cross attempted to sell defendant a video game but was unable to make the sale, that defendant lost his wallet and suspected that Cross, Brefford, or Williams had taken it, that Cross angrily grabbed Brefford and started hitting him just before defendant fired the first shot, and that defendant stood over Cross and fired multiple shots at him as he lay on the ground.  In addition, the evidence that Cross sustained seven gunshot wounds corroborates the testimony of Brefford and Williams that defendant stood over Cross and shot him multiple times.

It is the function of the jury to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence (People v. Tenney, 205 Ill. 2d 411, 428 (2002)), and while we agree with defendant that the testimony of Brefford and Williams was imperfect, those imperfections were presented and argued  to the jury at trial and were insufficient to persuade the jury to reject their testimony.  After considering all of the evidence in the light most favorable to the State, we conclude that a rational jury could have found defendant guilty of first degree murder beyond a reasonable doubt.

## II. Coerced Verdict

Defendant next contends that the trial court committed plain error by coercing the jury

into returning a verdict after the jury had indicated that it was deadlocked. The State initially asserts that defendant has forfeited review of this issue by failing to raise it in his posttrial motion for a new trial, and defendant responds that we should review this issue under the plain-error doctrine.

Although an error is generally not preserved for review unless the defendant objects at trial and includes the error in a written posttrial motion, the plain-error rule bypasses normal forfeiture principles and permits reviewing courts to consider unpreserved error in certain circumstances. People v. Averett, 237 Ill. 2d 1, 18 (2010). A reviewing court may consider unpreserved error under the plain-error doctrine when the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. People v. Piatkowski, 225 Ill. 2d 551, 565 (2007). The first step in conducting plain-error review is to determine whether error occurred at all. People v. Walker, 232 Ill. 2d 113, 124-25 (2009).

A trial court's comments to the jury are improper where, under the totality of the circumstances, the language used actually interfered with the jury's deliberations and coerced a guilty verdict. People v. Fields, 285 Ill. App. 3d 1020, 1029 (1996). Coercion is a highly subjective concept that does not lend itself to precise definition or testing and, as a result, a reviewing court's decision often turns on the difficult task of ascertaining whether the challenged comments imposed such pressure on the minority jurors as to cause them to defer to the

conclusions of the majority for the purpose of reaching a verdict. People v. Branch, 123 Ill. App. 3d 245, 251 (1984). While the length of the deliberations following a trial court's comments is alone insufficient to determine whether the comments were the primary factor in procuring a verdict, brief deliberations invite an inference of coercion. People v. Ferro, 195 Ill. App. 3d 282, 292 (1990).

The record shows that the jury began deliberations at 12:40 p.m. on the afternoon of May 9, 2008. At 3:25 p.m., the trial court received a note from the jury relating that "[w]e are 11 to 1 on all 4 propositions," and at 3:30 p.m., the court met with the parties to determine how to respond to the jury's note. Defense counsel suggested, and the prosecutor agreed, that the court should send a note back to the jurors telling them to continue to deliberate. The court decided to send a note to the jury, in which it stated that "[w]hen you were sworn in as jurors and placed under oath you pledged to obtain a verdict. Please continue to deliberate and obtain a verdict." Defense counsel responded that she believed that an admonition to continue to deliberate was sufficient at that time and objected to the extra wording beyond that message, and the court sent the note to the jury over the defense's objection. At 4:10 p.m., the jury reached a verdict finding defendant guilty of first degree murder and aggravated unlawful restraint.

Defendant asserts that the trial court's note to the jury was the equivalent of an Allen charge because it indicated to the jurors that they must return a verdict and placed undue pressure on the dissenting juror to join the majority simply for the sake of reaching a verdict to satisfy that juror's duty. In People v. Prim, 53 Ill. 2d 62 (1972), our supreme court addressed the issue of a trial court's delivery of supplemental instructions to a deadlocked jury. The court noted that

severe criticism had been levied at the giving of Allen charges, named after the United States

Supreme Court's decision in Allen v. United States, 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154

(1896), which contained language urging those in the minority of a jury to reevaluate their

positions in light of the fact that the majority of the jury had heard the same evidence and taken a

different position. Prim, 53 Ill. 2d at 72-73. The court then designed an instruction based on

standards suggested by the American Bar Association that avoided the coercive dangers inherent

in an Allen charge and directed trial courts to give a similar instruction when faced with a

deadlocked jury. Prim, 53 Ill. 2d at 74-76.

In this case, the trial court did not respond to the jury's note by issuing a Prim instruction,

but instead sent a note to the jury directing that "[w]hen you were sworn in as jurors and placed

under oath you pledged to obtain a verdict. Please continue to deliberate and obtain a verdict."

While we agree with the State that the mere failure to issue a Prim instruction is not reversible

error, we determine that the court's note to the jury was coercive and the equivalent of an Allen

charge because it conveyed to the jurors that they must arrive at a verdict and did not leave open

the option of returning no verdict if they were unable to reach a consensus. Ferro, 195 Ill. App.

3d at 293; People v. Robertson, 92 Ill. App. 3d 806, 808-09 (1981).

In Ferro, 195 Ill. App. 3d at 292-93, the trial court told the jurors that if they were not

going to be able to reach a verdict, they would be housed in a local motel until they did reach a

verdict, and this court determined that those comments were coercive because they conveyed to

the jurors that they must arrive at a verdict and did not have the option of returning no verdict. In

Robertson, 92 Ill. App. 3d at 808, the trial court delivered a Prim instruction to the jury, and then

commented that it did not see any reason why the jury could not arrive at verdicts and directed that the jurors could not be deadlocked. This court determined that the additional comments beyond the Prim instruction had the same coercive effect as an Allen charge because they unduly pressured the minority jurors to "'heed the majority'" for the purpose of returning a verdict. Robertson, 92 Ill. App. 3d at 809.

Similarly, the trial court's note to the jury in this case indicated that being deadlocked was not an option, that the jurors were required by their oath to obtain a verdict, and that they would be required to continue to deliberate until a verdict was reached. Although the court did not explicitly state that a deadlock was an impossibility, the court gave the impression that the jurors had to reach a verdict in order to satisfy their obligations as jurors (Branch, 123 Ill. App. 3d at 251-52 (trial court's comments found to be coercive where they implied that the lone minority juror's refusal to defer to the majority position should have disqualified him from jury service)), and the court did not leave open the option of returning no verdict by directing the jurors "to deliberate *and* obtain a verdict." (Emphasis added.) In addition, the trial court did not instruct the jury that no juror should surrender his or her honest conviction as to the weight or effect of the evidence merely to agree with his or her fellow jurors or to reach a verdict, which would have counteracted the coercive nature of its note, as directed by our supreme court in Prim, 53 Ill. 2d at 76. Branch, 123 Ill. App. 3d at 254. We thus conclude that the trial court's note to the jury interfered with the jury's deliberations and coerced a guilty verdict.

In reaching that conclusion, we have considered the length of the deliberations following the delivery of the trial court's note to the jury and determine that it does not invite an inference

for or against coercion because instructions have been found to be both coercive (Robertson, 92 Ill. App. 3d at 808-09) and not coercive (People v. Thomas, 185 Ill. App. 3d 1050, 1057-58 (1989), rev'd on other grounds, People v. Shields, 143 Ill. 2d 435 (1991)) based on the content of the instructions where guilty verdicts were returned following similarly long deliberations. In addition, although the jury was polled in this case, "[t]he polling of the jury [does] not cure the error or establish a lack of prejudice." People v. Pankey, 58 Ill. App. 3d 924, 928 (1978).

We have also considered People v. Buckner, 121 Ill. App. 3d 391 (1984), and People v. Rollins, 108 Ill. App. 3d 480 (1982), cited by the State, and find them distinguishable from this case. In both Buckner, 121 Ill. App. 3d at 399-402, and Rollins, 108 Ill. App. 3d at 485-86, the trial courts' comments were made in response to the entry of partial verdicts, and this court held that it was not coercive to direct the jurors to continue to deliberate and reach verdicts on the remaining counts. In addition, in Buckner, 121 Ill. App. 3d at 402, this court held that the defendant could not have been prejudiced by the trial court's comments because the jury remained deadlocked on the remaining two counts. In this case, however, the trial court was not presented with a situation where it was necessary to instruct the jury that reaching a guilty verdict on some counts did not relieve the jurors of their responsibility to continue to deliberate and attempt to reach a verdict on the other counts, and the jury did not remain deadlocked.

Having concluded that the trial court erred in giving a coercive instruction to the jury, we now determine that the error is reviewable under the second prong of the plain-error doctrine because the court's instruction resulted in a coerced verdict that affected defendant's right to a fair trial and challenged the integrity of the judicial process. People v. Eppinger, 293 Ill. App. 3d

306, 311 (1997). In addition, we determine that the evidence was closely balanced in this case and the error is reviewable under the first prong of the plain-error doctrine because the credibility of Brefford and Williams was diminished for the reasons previously set forth by defendant. Thus, defendant's procedural default of this issue is excused, and we therefore reverse his convictions and sentences and remand for a new trial.

Since we have already determined that the evidence presented at trial was sufficient to support a finding of defendant's guilt of first degree murder beyond a reasonable doubt and accordingly now also determine that the evidence was sufficient to prove him guilty of aggravated unlawful restraint beyond a reasonable doubt, he faces no risk of double jeopardy and may be retried. People v. Cruz, 162 Ill. 2d 314, 374 (1994). In addition, although we are reversing defendant's convictions and remanding for a new trial, a number of the other issues raised by defendant in this appeal could arise on retrial, and we therefore consider them below.

### III. Testimony of Quincy Page

Defendant next contends that the trial court abused its discretion when it barred the testimony of Quincy Page as to an out-of-court statement in which Williams allegedly admitted to shooting Cross. Testimony as to an out-of-court statement that is offered to establish the truth of the matter asserted is hearsay and is generally not admissible in evidence. People v. Lawler, 142 Ill. 2d 548, 557 (1991). However, evidence of an out-of-court statement made against the declarant's penal interest is admissible where justice requires and where sufficient indicia of the trustworthiness of the statement are present. People v. Olinger, 176 Ill. 2d 326, 357 (1997).

Four factors to consider in determining whether there are sufficient indicia of

trustworthiness to render evidence of an out-of-court statement against penal interest admissible are: (1) whether the statement was made spontaneously to a close acquaintance shortly after the crime had occurred; (2) whether the statement is corroborated by other evidence; (3) whether the statement was self-incriminating and against the declarant's penal interest; and (4) whether there was an adequate opportunity to cross-examine the declarant. Chambers 410 U.S. at 300-01, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048. The factors identified by the United States Supreme Court in Chambers are merely guidelines, and the presence of all four factors is not a condition of admissibility. Tenney, 205 Ill. 2d at 435. The primary consideration is whether the extrajudicial statement was made under circumstances which provide considerable assurance of its reliability by objective indicia of trustworthiness. Tenney, 205 Ill. 2d at 435. The decision of whether to admit evidence under the hearsay exception for a statement made against penal interest is within the sound discretion of the trial court, and its ruling will not be reversed absent a showing of the abuse of that discretion. People v. Bowel, 111 Ill. 2d 58, 68 (1986).

The record shows that Page provided defense counsel with a signed statement in which he related that he was at his grandmother's house in Markham, Illinois, on November 23, 1997. Sometime between 6 and 7:30 p.m. that evening Williams arrived at Page's grandmother's house and was sweaty and shaky and looked scared. Williams told Page that he had just shot Cross and might have killed him. As they walked to a friend's house, Williams explained that he and Cross had stolen a car and taken the rims and that they had gotten into an argument because Cross had tried to take more than his share of the money from the rims. Cross, who was a Golden Gloves boxer, came at Williams with his fists and Williams pulled out a pistol and shot him. Page knew

that Williams always kept a pistol with him because he often robbed people and was a gang member, and he needed it for protection. Williams told Page that he had shot Cross once in the head and then emptied the clip into Cross's body before running away.

Prior to trial, the State filed a motion to bar Page from testifying as to Williams' alleged confession because it was inadmissible hearsay and did not fall within the Chambers exception. Defendant filed a response and, following argument, the trial court initially denied the State's motion, but later revisited the issue and barred Page's testimony. In doing so, the court stated that although it was initially inclined to allow Page to testify, it ultimately determined that the second Chambers factor had not been satisfied because there was no independent corroboration of Williams' confession and that the statement was therefore inadmissible.

Defendant asserts that the trial court abused its discretion by granting the State's motion to bar Page's testimony because Williams' statement satisfies all four Chambers factors. We initially note that the parties agree that the statement satisfies the third and fourth factors because it was self-incriminating and against Williams' penal interest, and he was available for cross-examination at trial.

Defendant maintains that the first Chambers factor is also satisfied because Williams spontaneously made his statement to his friend Page just a few hours after he had shot Cross. The State does not contest that the statement was made spontaneously and shortly after the shooting, but asserts that there was no evidence that Williams and Page were close acquaintances because Page did not explain his relationship with Williams in his signed statement and Williams testified at trial that Page was just "[a]nother guy I know." However, defendant set forth in his

response to the State's motion, and defense counsel asserted at the hearing on the motion, that Page would testify that he and Williams were active members of the same gang and knew each other well enough that Williams knew that he was at his grandmother's house on the evening of the shooting. Thus, the first Chambers factor is satisfied in this case. See People v. Hernandez, 267 Ill. App. 3d 429, 435 (1994) (test for acquaintanceship met where witness and declarant are fellow gang members).

Defendant also maintains that Williams' confession satisfies the second Chambers factor because it was sufficiently corroborated by other evidence. In Tenney, 205 Ill. 2d at 437, our supreme court stated that the second factor requires only that the statement be corroborated by "some other evidence," that the trial court should favor admitting the statement if the issue of the sufficiency of corroborating evidence is close, and that the ultimate determination concerning the truth of the statement is to be made by the jury.

We determine that the second Chambers factor is satisfied in this case because there was some other evidence that corroborated Williams' statement. Page related in his signed statement that Williams told him that he had shot Cross in the head once and then emptied his clip into Cross's body. Williams' description of how he shot Cross is corroborated by Dr. Ralston's testimony that Cross sustained seven gunshot wounds, including a graze wound to the left side of his head, and is also consistent with his own testimony and that of Brefford that the shooter stood over Cross and fired his gun multiple times. In addition, Williams' statement that he had just recently shot Cross was consistent with his and Brefford's testimony regarding the time at which the shooting occurred, and Williams' statement that he ran away after the shooting was consistent

with his own testimony as well.

The State asserts that the evidence corroborating Williams' statement does not provide sufficient indicia of trustworthiness because knowledge of that evidence was available to any of the bystanders who were on the street following the shooting. However, such concerns go to the weight to be accorded Page's testimony, rather than its admissibility. People v. Nally, 216 Ill. App. 3d 742, 769 (1991). The State also asserts that Williams' statement was contradicted, rather than corroborated, by the evidence at trial, which showed that defendant was the shooter. While we agree that the testimony of Williams and Brefford contradicted Williams' confession as to the identity of the shooter and the reason the shooting occurred, those contradictions do not substantially weaken the statement's trustworthiness in this case because the purpose of introducing it into evidence was to contradict that testimony on the theory that it was fabricated so as to shift blame for the shooting from Williams to defendant. In addition, the remaining evidence regarding the manner of the shooting actually corroborated the statement for the reasons stated above. See People v. Kokoraleis, 149 Ill. App. 3d 1000, 1022 (1986) (two statements against penal interest admissible where partially inconsistent with each other but corroborated by certain facts in the case). We thus conclude that Williams' statement satisfies each of the four Chambers factors and that the trial court therefore abused its discretion by granting the State's motion in limine and barring Page from testifying as to that statement.

IV. Evidence of Defendant's Flight

Defendant further contends that the trial court erred by admitting evidence of his flight because it was more prejudicial than probative. The State initially asserts that defendant has

forfeited review of this issue by failing to raise it in his posttrial motion for a new trial, and defendant responds that we should review this issue for plain error. In conducting plain-error review, we first determine whether error occurred at all. Walker, 232 Ill. 2d at 124-25.

"Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable." People v. Nelson, 235 Ill. 2d 386, 432 (2009). "[A] trial court may exercise its discretion to exclude evidence, even when it is relevant if its prejudicial effect substantially outweighs its probative value." People v. Walker, 211 Ill. 2d 317, 337 (2004).

Defendant asserts that the evidence of his flight has no probative value because the State did not present any evidence showing that he had knowledge of the shooting or that he was being sought as a suspect in connection with it and that the evidence was highly prejudicial because it led the jury to believe that he was a bad person and had something to hide. The State responds that the evidence of defendant's flight is relevant and admissible as proof of his consciousness of guilt.

Whether an inference of guilt may be drawn from evidence of flight depends on the defendant's knowledge that the crime has been committed and that he is or may be suspected to be the culprit. People v. Harris, 23 Ill. 2d 270, 273 (1961). "While evidence that a defendant was aware that he was a suspect is essential to prove flight, actual knowledge of his possible arrest is not necessary to render such evidence admissible where there is evidence from which [that] fact may be inferred." People v. Lewis, 165 Ill. 2d 305, 350 (1995).

We determine that the evidence of defendant's alleged flight is of little to no probative value as to his consciousness of guilt because the evidence does not show that he was aware that

he was a suspect. There is no evidence that Dajuan Walker, or anyone else, told defendant that police were looking for him in connection with a murder. While defendant testified that Walker informed him that police wanted to question him, he also testified that Walker did not know what police wanted to question him about and that he believed the police wanted to question him because he had violated his "I-Bond" in connection with a prior arrest for criminal trespass.

The State asserts that although there was no direct evidence that defendant knew he was a suspect in Cross's murder, other evidence presented at trial provide a sufficient basis to support an inference that defendant fled Illinois and used an alias in order to avoid arrest. However, while defendant testified that Walker had told him that the Robbins police had wanted to question him, the record shows that the shooting occurred in Harvey and that he had been arrested in Robbins about two weeks before the shooting for criminal trespass. In addition, although defendant testified that he obtained a fake identification card under the name Dajuan Walker while he was in Columbus, the record shows that the identification card was issued on June 18, 2002, about 4½ years after the shooting had occurred. If defendant had been fleeing from the murder, he most likely would not have waited so long to obtain fake identification.

We thus determine that the other evidence presented at trial does not support an inference that defendant had fled Illinois and used an alias to avoid his arrest for the murder of Cross and that such evidence is therefore of little to no probative value. We also determine that the alleged flight evidence, and the evidence of defendant's use of a fake identification card in particular, was prejudicial to defendant because it could easily lead the jury to believe that defendant was a bad person and untrustworthy. As such, we conclude that the trial court abused its discretion by

1-08-2068

admitting evidence of defendant's alleged flight.

As we have already stated, the evidence was closely balanced in this case. In addition, evidence of defendant's alleged flight was heavily relied upon during closing argument by the prosecutor and the error in admitting that evidence therefore threatens to tip the scales of justice against defendant. As such, this issue is reviewable under the first prong of the plain-error doctrine. Piatkowski, 225 Ill. 2d at 565.

Since we are reversing defendant's convictions and remanding for a new trial, we need not reach the remaining issues of whether defendant was denied the effective assistance of counsel, whether the trial court erred by denying the defense's motion for mistrial on the basis that one of the jurors decided defendant's guilt prior to closing argument, or whether the trial court improperly considered factors in aggravation and mitigation during sentencing.

Accordingly, we reverse defendant's convictions and sentences and remand for a new trial consistent with this opinion.

Reversed and remanded.

LAVIN and PUCINSKI, JJ., concur.

1-08-2068

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each case)

THE PEOPLE OF THE STATE OF ILLINOIS,

        Plaintiff-Appellee,

v.

KEITH WILCOX,

        Defendant-Appellant,

No. 1-08-2068

Appellate Court of Illinois
First District, Fourth Division

December 30, 2010

PRESIDING JUSTICE GALLAGHER delivered the opinion of the court.

LAVIN and PUCINSKI, JJ., concur.

Appeal from the Circuit Court of Cook County.

Honorable Brian Flaherty, Judge Presiding.

For APPELLANT, Office of the State Appellate Defender, Chicago, IL (Michael J. Pelletier, Patricia Unsinn, Jonathan Steffy, of counsel).

For APPELLEE, Cook County State's Attorney, Chicago, IL (Anita Alvarez, Alan J. Spellberg, Ashley A. Romito, Jessica R. Ball, of counsel).