2021 IL App (1st) 200985-U

SIXTH DIVISION
December 10, 2021

No. 1-20-0985

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 60227 |
| | ) | |
| LEVANT WALKER, | ) | Honorable |
| | ) | Michael Clancy, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Pierce and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for residential burglary is affirmed where (1) the evidence was sufficient and (2) the trial court did not abuse its discretion when it did not declare a mistrial and instructed the jury to continue deliberating.

¶ 2    Following a jury trial, defendant Levant Walker was found guilty of residential burglary and sentenced to seven years in prison. On appeal, Mr. Walker argues that (1) the State failed to prove him guilty of residential burglary beyond a reasonable doubt, and (2) the trial court abused its discretion by effectively coercing a verdict when it refused to declare a mistrial. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Levant "Mississippi" Walker was charged with one count of residential burglary for breaking and entering the home of Carter Martin on August 17, 2019. After being admonished by the judge, Mr. Walker chose to represent himself at trial.

¶ 5     At the trial, Mr. Martin testified that on August 17, 2019, at around 10:30 a.m., he was watching television alone in his home at 7950 South Wood Street when he heard glass shatter in the kitchen. He went to his kitchen, located at the back of his house, and discovered a broken window and glass on the floor. He called 9-1-1 and went to the front of his home to wait for the police.

¶ 6     Mr. Martin testified that shortly after calling 9-1-1, he heard a "boom" from the kitchen and again went to see what it was. In the kitchen, Mr. Martin saw an individual he recognized as Mr. Walker grasping the inner portion of the windowsill with his shoulders, head, and chest through the window. Mr. Walker was shirtless, wearing only blue jeans and white gym shoes. Mr. Martin said, "what the f****," then saw Mr. Walker push back out of the window, fall to the ground, and run down a nearby alley. Mr. Martin testified that he had an unobstructed view of Mr. Walker's face and saw Mr. Walker's arms touch the glass as he was leaving the window. Mr. Martin testified that prior to the incident, he had seen Mr. Walker in person approximately six or seven times. Mr. Martin said he had never given Mr. Walker permission to enter or take anything from his home, and Mr. Walker had never been inside Mr. Martin's home before the incident. Mr. Martin again called 9-1-1, and soon two Chicago police officers arrived.

¶ 7     Officer Yore testified that he and his partner, Officer Mohammad, were assigned to investigate the burglary at Mr. Martin's house. When they arrived, Mr. Martin told the officers that he had heard glass breaking and that the person who he knew as "Mississippi" was trying to

crawl through the window to enter his home. Officer Yore confirmed that the window was broken. However, he did not see any blood on the scene, and Mr. Martin similarly said there was no blood in the kitchen or the yard. The officers took photos of the scene. Mr. Martin testified that the window was about five or six feet from the ground. In contrast, Officer Yore testified that the window was about 10 feet from the ground, but said he believed that the window was accessible from the porch. Whatever item was used to break the window was not found on the scene. After the incident, Mr. Martin had placed a screen in the broken window. The State published clips from the body cameras worn by Officers Yore and Mohammad during their time at Mr. Walker's home.

¶ 8    Mr. Martin testified that on the day after the incident, August 18, 2019, he was walking to a nearby store between 1 and 1:30 p.m. when he saw Mr. Walker talking to another person. As Mr. Martin passed Mr. Walker, Mr. Walker smiled, and Mr. Martin told him, "[w]e going to get you." Mr. Martin then ran to a police car that was stopped at a stop sign about 50 feet away. Mr. Martin told the officer in the car, Officer Perdue, that he had just passed Mr. Walker, who had broken into his house, and gave the officer Mr. Walker's description; specifically, that Mr. Walker was a man in his 40s, wearing navy blue pants and a white shirt. Officer Perdue put out a flash message of the description and had Mr. Martin get into the back of his squad car.

¶ 9    After about 15 minutes, Officers Diaz and Alcaraz radioed that they had a person in an alley matching Mr. Walker's description. Upon arriving on the scene, Mr. Martin confirmed that the suspect was Mr. Walker. Officer Perdue conducted a pre-arrest protective pat down, during which he noticed that Mr. Walker's inner biceps were bandaged with tissue paper and Scotch tape. Mr. Walker was arrested and taken back to the police station.

¶ 10    At the police station, Mr. Walker was interviewed by Detective Terance Nalls and another detective. Detective Nalls also testified that Mr. Walker's inner biceps were wrapped with tissue

paper and Scotch tape. Detective Nalls testified that the interview was not recorded because recording an interview is not required for residential burglary crimes under Chicago Police Department directives and statutes. According to the detective, after being read his *Miranda* rights, Mr. Walker indicated that he understood his rights and agreed to speak to the detectives. Detective Nalls testified that when he asked what had happened, Mr. Walker said that he went to the residence "to take s****." When asked how he got into the window, Mr. Walker said that he went up the back stairs and broke the window with a brick. From there, he was able to lean across the porch and climb through the window. Mr. Walker said that after he got further inside the window, the owner of the house saw him, so he exited the window, fell to the ground, and took off running. Detective Nalls also said that Mr. Walker explained that he sustained cuts on his upper body underneath his arms when he fell from the window. Detective Nalls did not get a signed written version of Mr. Walker's statements.

¶ 11    Mr. Walker did not testify.

¶ 12    The jury deliberations spanned two different days, during which several questions were asked by the jury. Because Mr. Walker is arguing that this process resulted in a coerced verdict, we will discuss the deliberations in more detail below. Ultimately, the jury found Mr. Walker guilty of residential burglary.

¶ 13    The trial court denied Mr. Walker's motion for a new trial and sentenced Mr. Walker to seven years in prison. The court also denied Mr. Walker's motion to reconsider his sentence. This appeal followed.

¶ 14                    II. JURISDICTION

¶ 15    Mr. Walker's motion to reconsider his sentence was denied on August 11, 2020, and he timely filed his notice of appeal on August 20, 2020. We have jurisdiction pursuant to article VI,

section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 16                                     III. ANALYSIS

¶ 17                     A. The Evidence Was Sufficient to Support the Verdict

¶ 18     On appeal, Mr. Walker argues that the evidence was insufficient to prove beyond a reasonable doubt that he was guilty of residential burglary. Specifically, he argues that the evidence was insufficient to show that he had pulled himself through the window, as Mr. Martin claimed, because (1) there was no blood on the broken glass or at the scene, and (2) to the extent that Mr. Martin's testimony was confirmed by Mr. Walker's own statement to detectives, that statement was not memorialized, and should not therefore have been relied on.

¶ 19     Due process provides that a defendant may not be convicted "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When reviewing a challenge to the sufficiency of the evidence, a reviewing court will not retry a defendant. *People v. Cox*, 195 Ill. 2d 378, 387 (2001). Instead, the reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trier of fact remains responsible for "making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *People v. Ross*, 229 Ill. 2d 255, 272 (2008). However, a conviction will be set aside where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

¶ 20    To convict a defendant of residential burglary, the State must prove that the defendant knowingly entered the dwelling of another without authority and with intent to commit a theft or felony. 720 ILCS 5/19-3(a) (West 2018). The evidence here is sufficient to convict Mr. Walker of residential burglary. That evidence included the testimony of Mr. Martin that he was at his home when he heard glass break, he discovered a window in his kitchen had been broken, and later saw Mr. Walker climbing through the broken window. Mr. Martin identified Mr. Walker as the individual who had been climbing through the window both to police at his house the day of the incident and the following day when Mr. Walker was apprehended.

¶ 21    This firsthand account is confirmed by Detective Nalls's testimony about what Mr. Walker acknowledged in his police interview. Mr. Walker admitted that he went to Mr. Martin's home "to take s****" and entered the home by going up the back stairs, breaking the window with a brick, and leaning across the porch railing to climb through the window.

¶ 22    Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have found the evidence and testimony established that Mr. Walker had entered Mr. Martin's home, by putting himself through the window that he had broken, without Mr. Martin's authority and with an intent to commit a theft.

¶ 23    Mr. Walker argues that the evidence is contradicted by the fact that Mr. Walker did not have any injuries on his hands or forearms when he was arrested the following day. Mr. Walker claims that this is inconsistent with his having climbed through the window because in the photographs shown to the jury the windowsill still had shards of broken glass on it. According to Mr. Walker, if he had crawled into the window, he would have been unable to avoid cutting his hands on those shards.

¶ 24    While Mr. Walker did not have cuts on his hands or forearms, he did have cuts on the inside

of his biceps. Both Officer Perdue and Detective Nalls testified that they saw these injuries. Also, the jury was aware that there was no blood on the scene through the testimony of both Mr. Martin and Officer Yore and was able to consider this as part of its deliberations.

¶ 25    The jury could have reasonably believed that Mr. Walker was careful going into the window but cut his biceps while falling out of the window. They also could have reasonably inferred that, given that Mr. Walker bandaged his cuts with just tissue paper and scotch tape, the cuts were not the kind that would yield copious amounts of blood. It is the responsibility of the trier of fact, not this court, to "weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009).

¶ 26    Similarly, Mr. Walker relies on the fact that no brick or other object was ever recovered to confirm Mr. Martin's testimony that Mr. Walker threw a brick through his window. However, the jury saw photographs depicting the broken window so there was clearly some physical evidence to corroborate that aspect of Mr. Martin's testimony.

¶ 27    Mr. Walker also argues that his alleged confession to Detective Nalls after his arrest could not be used to bolster the guilty verdict as it was "unbelievable" because it was not memorialized in writing. The jury was aware, through Detective Nalls's testimony, that Mr. Walker's alleged confession was not memorialized in writing. It was the jury's responsibility to determine whether Detective Nalls's testimony, in the absence of a memorialized and signed statement, was credible. A reviewing court cannot substitute its own judgment for that of the trier of fact on issues of witness credibility (*People v. Cooper*, 194 Ill. 2d 419, 431 (2000)), and we will not do so here.

¶ 28    Additionally, just as Mr. Walker's statement corroborated Mr. Martin's testimony, Mr. Martin's testimony corroborated Detective Nalls's testimony about Mr. Walker's admissions. Detective Nalls testified that Mr. Walker said he went to Mr. Martin's house "to take s****" and

that Mr. Walker said he got into the window by going up the back stairs and using a brick to break the glass, then leaned over the porch railing and climbed through the window. This is in line with the testimony given by Mr. Martin, who said that he heard a glass breaking and saw the broken window in his kitchen and, after briefly leaving the kitchen to call police, saw Mr. Walker climbing through the broken window. These two versions of what occurred corroborated each other.

¶ 29    Nothing in the finding of guilt was so unreasonable, improbable, or unsatisfactory to shed doubt on the jury's verdict. In sum, the evidence, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support the jury's determination that Mr. Walker entered Mr. Martin's home without his authority with an intent to commit a theft.

¶ 30                    B. The Trial Court Did Not Coerce the Jury's Verdict

¶ 31    Mr. Walker next argues that the trial court coerced the jury's verdict by refusing to declare a mistrial. At the conclusion of the trial, but before deliberations began, the judge gave the following jury instructions that are relevant to this issue:

> "You have before you evidence the defendant made a statement relating to the offense charged in the information. It is for you to determine whether the defendant made the statement and if so, what weight should be given to the statement. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made.
>
> ***
>
> A person commits the offense of residential burglary when he knowingly and without authority enters the dwelling place of another with the intent to commit therein the offense of theft.
>
> The term dwelling place means a house *** which at the time of the alleged offense,

the owner actually resides—the owners actually reside or in their absence intend within a reasonable period of time to reside.

To sustain the charge of residential burglary, the State must prove the following propositions: First, that the defendant knowingly entered the dwelling place of another. And second, that the defendant did so without authority. And third, that the defendant did so with the intent therein to commit the offense of theft.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty. If you find from your considerations of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 32    Deliberations began at 3:30 p.m. on November 14, 2019. At 5 p.m., the trial court indicated it had received several questions from the jury. The transcript reflects that the court reported to the State and Mr. Walker as follows:

"[Juror 1] is the, I assume the author whose name is first on it.

[Juror 1]: May we be granted a law book with thorough definitions of the crime.

Second question: Is it standard police protocol for Detective Nalls and the other detective to have the defendant not sign his comment 'I was there to take shit.'

[Juror 2]. Number three: Is it standard procedure for the evidence team to come out on the same day of the crime or does this happen the next day afterwards?

The fourth question is does the third point of the definition of residential burglary mean an intent of burglary must be proven by direct evidence of something stolen, or is it to be assumed that intent was specifically for robbing the residence. [Juror 1]."

¶ 33    The court asked the parties for a response, and the State argued that the court should simply say that they had been given the law that applied to the case and "ha[d] all the evidence." Mr. Walker asked that "some type of law books" be sent to the jury to help them "really understand the definition of burglary and things of that nature."

¶ 34    The court thanked the parties for their responses and said it would respond that "the law that applies to this case is stated in the instructions" and that "the evidence which you should consider consists only of the testimony of the witnesses and the exhibits and stipulations which the court has received." Mr. Walker again asked the judge to send a law book to the jury, and the judge again declined, explaining that the jury generally cannot have a law book. The court noted that "neither the State nor the defense" had introduced any evidence at trial of "a standard police protocol with Detective Nalls or anyone else," so that evidence, if it in fact existed, should not be considered.

¶ 35    The court sent the jurors the first answers to their questions at 5:15 p.m. At 5:30 p.m., another note came from the jury requesting transcripts. Again, the court reported this to the State and to Mr. Walker. The court advised the parties that he would respond to that request by stating:

"Those of you who took notes during trial may use your notes to refresh your memory during jury deliberation. Each juror should rely on his or her recollection of the evidence. Just because a juror has taken notes does not necessarily mean that his or her recollection of the evidence is any better or more accurate than the recollection of a juror who did not take notes.

Court transcript copies or copy of court transcripts [are] not available at this time."

Neither party objected and the court sent this response at 5:40 p.m., telling the jury to "[c]ontinue to deliberate."

¶ 36    At 5:55 p.m., the jurors sent a third note that said, "[d]espite thorough deliberation, we are unable to reach a unanimous decision. Thank you." The court raised the question with Mr. Walker and with the State whether it should simply respond "continue to deliberate" or give the jury Illinois Pattern Jury Instructions, Criminal, No. 26.07 (4th ed. 2000), commonly known as a *Prim* instruction (see *People v. Prim*, 53 Ill. 2d 62, 75-76 (1972)). The State requested the *Prim* instruction and Mr. Walker said, "[d]oesn't matter to me, your Honor. Give it to them." The court then brought the jurors back into the courtroom and instructed them as follows, in accord with *Prim*:

> "The verdict must represent the considered judgment of each juror. In order to return a verdict it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment.

> Each of you must decide the case for yourself. But do so only after impartial consideration of the evidence with your fellow jurors.

> In the course of your deliberations do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or affect [*sic*] of the evidence solely because of your fellow jurors. Or for the mere purpose of returning a verdict.

> You are not partisans, you are judges. Judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

> Ask you to please go back to the jury[ ]room. You will get this instruction in writing and please continue to deliberate."

¶ 37    The court allowed the jury to continue deliberations until 7 p.m., at which time it sent them home until the following day.

¶ 38    Although it is unclear from the record when deliberations resumed, the jury was told to arrive at 9:30 a.m. the following day. At some unspecified time, another note was received from the jury. The first question read, "[d]ear Judge, some members of the jury find the Defendant not guilty due to the fact that they believe the law was misapplied by the Prosecution in this case. What do we do in this case?" A second question read, "[w]hat do we do if someone is convinced of their own opinion of what burglary [is] over the law?"

¶ 39    The judge again reported these notes to the State and to Mr. Walker. Mr. Walker again wanted a definition of burglary provided to the jury, while the State maintained that the jury already had the proper definition of burglary and "all the evidence" that it could consider in deciding whether the State had established the elements of that offense. The State further said that "[a]t this point, if there's somebody back there who's refusing to deliberate or refusing to follow the law as given to them by the Court, which is the actual law, then we either need to strike that person and put an alternate in, or we need to hang [the jury]," to which Mr. Walker responded, "[n]o, I object to that." The judge informed the parties that it would respond to the questions by telling the jury that he had provided them with the applicable law during the jury instructions, that the law must be followed, and that they had agreed to follow the law. When the court brought the jury out again, its precise instructions were as follows:

> "The law that applies to this case is stated in the instructions that you have received and it is your duty to follow all of them. You must not single out certain instructions and disregard others.
>
> So again, let me repeat: The law that applies to this case is stated in these

instructions which you have, obviously, in back, and it is your duty to follow all of them. You must not single out certain instructions and disregard others.

And I want to go back to some questioning when we—when you were under oath and you were questioned by me earlier, before the jury was selected. We went through a number of things, but one of the questions I state—let you know is that at the end of the trial, I will instruct the jury on the law. The law must be followed even if you disagree with it.

* * *

What I think I probably said to you was this, word for word: You understand it is your duty to follow the law that I give to you, even if you personally disagree with it. And each of you answered, yes, that you understood that it's your duty to follow the law that I give you, even if you—even if you disagree with it.

So with those instructions, I'd ask you to go back to the jury room and continue to deliberate. Thank you."

¶ 40    The jury left the room. Mr. Walker then asked, again, for the definition of burglary "straight out of the book" to be sent to the jury. The court denied this request, maintaining that the jury instruction already given to the jury regarding the elements of burglary had been appropriate. Sometime later another note was sent, this time stating: "The jury environment is too hostile. We cannot come to a conclusion."

¶ 41    The court asked the parties for suggestions, and the State requested that the court question the person who was apparently refusing to follow the law, strike that person, and replace him or her with an alternate juror. Mr. Walker objected. The court declined to do as the State had suggested, opting instead to bring the jury back out, read them the *Prim* instruction again, and ask

them to continue deliberating.

¶ 42    The next time they came out, the jury delivered its verdict, finding Mr. Walker guilty of residential burglary. The court polled the jury and each juror assured the judge that that was his or her verdict.

¶ 43    Mr. Walker argues that the trial court effectively coerced the jury's guilty verdict by refusing to declare a mistrial after the jury "repeatedly" told the court that they were deadlocked. Mr. Walker is correct that the possibility of a hung jury is an inevitable byproduct of a unanimous verdict requirement, and "the jury cannot be compelled to reach a verdict in all instances." *People v. Gregory*, 184 Ill. App. 3d 676, 681 (1989). On the other hand, a "trial court has discretion to have the jury continue its deliberation even though the jury has reported it is deadlocked and will be unable to reach a verdict." *People v. Ferro*, 195 Ill. App. 3d 282, 292 (1990) (citing *People v. Cowan*, 105 Ill. 2d 324, 328 (1985)). Moreover, "a trial judge has the duty to provide guidance to a jury that is not hopelessly deadlocked." *Gregory*, 184 Ill. App. 3d at 681 (citing *People v. Prim*, 53 Ill. 2d 62, 64 (1972)). A trial judge's decision to continue deliberations will be reversed only if it is an abuse of the court's discretion, even where the jury has reported to the court that it is "hopelessly deadlocked." (Internal quotation marks omitted.) *People v. Green*, 91 Ill. App. 3d 1085, 1090 (1980). And an abuse of discretion exists "only where the trial court's ruling is so arbitrary or fanciful that no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 114.

¶ 44    If the court chooses to tell the jury to continue deliberations, that instruction "should be simple, neutral, and not coercive." *Ferro*, 195 Ill. App. 3d at 293. "The test for determining whether the trial court's comments to the jury were improper *** is whether, under the totality of the circumstances, the language used by the court actually interfered with the jury's deliberations

and coerced a guilty verdict." *People v. McCoy*, 405 Ill. App. 3d 269, 275 (2010). Because we are not privy to the jurors' subjective thoughts, we must examine the trial court's instructions to see if they likely "imposed such confusion or pressure on the jury to reach a verdict that the accuracy and integrity of the verdict returned becomes uncertain." *Id.*

¶ 45    Here, the jury deliberated for approximately three-and-a-half hours the first day, and during that time sent notes to the court three different times. With the third note, the jurors indicated for the first time that they were "unable to reach a unanimous decision." At this point, the court read the jury the *Prim* instruction for the first time. As our supreme court explained:

> "The *Prim* instruction informs the jury of the requirement that the verdict be unanimous; that the jury has a duty to deliberate; that jurors must impartially consider the evidence; and that jurors should not hesitate to reexamine their views and change their opinions if they believe them to be erroneous, provided the change is not solely because of the opinion of fellow jurors or for the mere purpose of returning a verdict." *People v. Chapman*, 194 Ill. 2d 186, 222 (2000).

¶ 46    The length of deliberations on the following day is unclear from the record. During that time, the court received two notes from the jury. In the first, two individuals indicated that at least one juror was not applying the law correctly. In response, the judge brought the jurors out and reminded them that before being sworn in they had assured the court that they would follow the law even if they disagreed with it. In the second note, the jury again indicated it could not reach a unanimous decision and, further, that the "jury environment [wa]s too hostile." The court gave the jurors a second *Prim* instruction and, after an undisclosed amount of time, the jury reached its verdict of guilty. The jurors were polled, and each indicated that this was his or her verdict.

¶ 47    We cannot say that the trial court here abused its discretion by instructing the jury to

continue their deliberations. The court gave the *Prim* instruction after the first time the jury indicated it was deadlocked, instructed the jurors that they had agreed to follow the law even if they did not agree with it when notes indicated that a juror may have been ignoring the law, and gave the *Prim* instruction a second time when the jury again indicated that it was deadlocked.

¶ 48 Mr. Walker argues that the trial court should have declared a mistrial in light of the jury "repeatedly communicat[ing] to the judge that it could not reach a unanimous verdict," "effectively request[ing]" the court do so "several times when reporting it was deadlocked," stating that "the environment in the jury room had become hostile," and "indicat[ing] that numerous jurors had ceased deliberating." But "[t]here is no requirement that a mistrial be declared because of the jurors' inability to come to a unanimous verdict immediately," and a trial court is *not* "required to accept a jury's assessment of its own ability to reach a verdict." *People v. Logston*, 196 Ill. App. 3d 30, 33 (1990).

¶ 49 This is not like *People v. Wilcox*, 407 Ill. App. 3d 151, 163 (2010), which is the case relied on by Mr. Walker. In *Wilcox*, the court told the jury, " '[w]hen you were sworn in as jurors and placed under oath you pledged to obtain a verdict. Please continue to deliberate and obtain a verdict." *Id.* In contrast, in the *Prim* instruction, the court here specifically stated, "do not surrender your honest conviction as to the weight or affect [*sic*] of the evidence solely because of your fellow jurors. Or for the mere purpose of returning a verdict." Unlike in *Wilcox,* the trial judge in this case never suggested to the jury that they would not be able to leave unless and until they reached a unanimous verdict.

¶ 50 Mr. Walker argues that the trial court's failure to declare a mistrial was "compounded by [its] refusal to engage with the jury's concerns." The trial court provided the jury with multiple simple, neutral, non-coercive instructions, after which the jury agreed on a verdict of guilty. Mr.

Walker provides no authority to suggest that the trial judge was required to do anything more.

Under the totality of the circumstances, we find no abuse of discretion by this trial judge.

¶ 51                    IV. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 53    Affirmed.